FEDERAL TRADE COMMISSION *v.*
RUBEROID CO.

NO. 448.

Argued March 31 and April 1, 1952.—Decided May 26, 1952.

*Cyrus Austin* argued the cause and filed a brief for the Ruberoid Company.

*James W. Cassedy* argued the cause for the Federal Trade Commission. With him on the brief were *Solicitor General Perlman, Assistant Attorney General Morison, Daniel M. Friedman, Ralph S. Spritzer* and *W. T. Kelley.*

472

MR. JUSTICE CLARK delivered the opinion of the Court.

In this case we granted cross-petitions for certiorari to review the decree of the Court of Appeals affirming, but refusing to enforce, a cease and desist order issued by the Federal Trade Commission to the Ruberoid Co.

Ruberoid is one of the nation's largest manufacturers of asphalt and asbestos roofing materials and allied products. The Commission found that Ruberoid, in a number of specific instances, had discriminated among customers in the prices charged them for roofing materials. Further finding that the effect of those discriminations "may be substantially to lessen competition in the line of commerce in which [those customers] are engaged, and to injure, destroy, or prevent competition between [those customers]," [1] the Commission held that the discriminations were violations of § 2 (a) of the Clayton Act, as amended by the Robinson-Patman Act.[2] 46 F. T. C. 379. Ruberoid was ordered to:

> "[C]ease and desist from discriminating in price:
> "By selling such products of like grade and quality to any purchaser at prices lower than those granted other purchasers who in fact compete with the favored purchaser in the resale or distribution of such products." [3]

Upon Ruberoid's petition for review, the Court of Appeals affirmed and granted enforcement of the order. 189 F. 2d 893. However, on rehearing, the Court of Appeals amended its mandate to strike that part which directed enforcement. 191 F. 2d 294. We granted certiorari to review questions, important in the administration of the Clayton Act, as to the scope and enforcement of Federal Trade Commission orders. 342 U. S. 917.

---

[1] 46 F. T. C. 379, 386.

[2] 38 Stat. 730, as amended, 49 Stat. 1526, 15 U. S. C. § 13.

[3] 46 F. T. C. 379, 387.

We first consider the contentions of Ruberoid, which are mainly attacks upon the breadth of the order. Orders of the Federal Trade Commission are not intended to impose criminal punishment or exact compensatory damages for past acts, but to prevent illegal practices in the future. In carrying out this function the Commission is not limited to prohibiting the illegal practice in the precise form in which it is found to have existed in the past. If the Commission is to attain the objectives Congress envisioned, it cannot be required to confine its road block to the narrow lane the transgressor has traveled; it must be allowed effectively to close all roads to the prohibited goal, so that its order may not be by-passed with impunity.[4] Moreover, "[t]he Commission has wide discretion in its choice of a remedy deemed adequate to cope with the unlawful practices" disclosed. *Jacob Siegel Co.* v. *Federal Trade Comm'n,* 327 U. S. 608, 611 (1946). Congress placed the primary responsibility for fashioning such orders upon the Commission, and Congress expected the Commission to exercise a special competence in formulating remedies to deal with problems in the general sphere of competitive practices.[5] Therefore we have said that "the courts will not interfere except where the remedy selected has no reasonable relation to the unlawful practices found to exist." *Id.,* at 613.

In the light of these principles, we examine the specific objections of Ruberoid to the order in this case. First, it is argued that the order went too far in prohibiting *all* price differentials between competing purchasers, although only differentials of 5% or more were found. But the Commission found that very small differences in price

---

[4] *Federal Trade Comm'n* v. *Morton Salt Co.,* 334 U. S. 37, 51–52 (1948); cf. *International Salt Co.* v. *United States,* 332 U. S. 392, 398–400 (1947).

[5] *Federal Trade Comm'n* v. *Cement Institute,* 333 U. S. 683, 726–727 (1948); 38 Stat. 722, 15 U. S. C. § 47.

were material factors in competition among Ruberoid's customers, and Ruberoid offered no evidence to the contrary. In this state of the record the Commission was not required to limit its prohibition to the specific differential shown to have been adopted in past violations of the statute.[6] In the absence of any indication that a lesser discrimination might not affect competition there was no need to afford an escape clause through which the seller might frustrate the whole purpose of the proceedings and the order by limiting future discrimination to something less than 5%.[7]

The roofing material customers of Ruberoid may be classified as wholesalers, retailers, and roofing contractors or applicators.[8] The discriminations found by the Commission were in sales to retailers and applicators. The

---

[6] *Federal Trade Comm'n* v. *Morton Salt Co.,* 334 U. S. 37, 51–52 (1948); cf. *Labor Board* v. *Express Publishing Co.,* 312 U. S. 426, 436–437 (1941).

[7] "True, the Commission did not merely prohibit future discounts, rebates, and allowances in the exact mathematical percentages previously utilized by respondent. Had the order done no more than that, respondent could have continued substantially the same unlawful practices despite the order by simply altering the discount percentages and the quantities of salt to which the percentages applied." *Federal Trade Comm'n* v. *Morton Salt Co.,* 334 U. S. 37, 52–53 (1948). The discussion following these words in the *Morton Salt* case, of certain aspects of the order in question there, manifestly affords no support to Ruberoid's contention here. *Id.,* at 53–54.

[8] Ruberoid suggests a fourth category of purchasers—manufacturers—and contends that the order is too broad in that it prohibits discrimination in sales to that group, *e. g.,* in sales of shingles to competing manufacturers of prefabricated houses. We need not consider whether such an order would be too broad because we do not think the order here applies to such sales. By its terms, the order covers only sales to those competitively engaged "in the resale or distribution of such products [*i. e.,* 'asbestos or asphalt roofing materials']," and not sales to those who use roofing materials in the fabrication of wholly new and different products.

Commission held that there was insufficient evidence in the record to establish discrimination among wholesalers, as such. Ruberoid contends that the order should have been similarly limited to sales to retailers and applicators. But there was ample evidence that Ruberoid's classification of its customers did not follow real functional differences. Thus some purchasers which Ruberoid designated as "wholesalers" and to which Ruberoid allowed extra discounts in fact competed with other purchasers as applicators. And the Commission found that some purchasers operated as both wholesalers and applicators. So finding, the Commission disregarded these ambiguous labels, which might be used to cloak discriminatory discounts to favored customers, and stated its order in terms of "purchasers who in fact compete." Thus stated, we think the order is understandable, reasonably related to the facts shown by the evidence, and within the broad discretion which the Commission possesses in determining remedies.

Finally, Ruberoid complains that the order enjoins lawful acts by failing to except from its prohibitions differentials which merely make allowance for differences in cost of manufacture, sale or delivery, or which are made in good faith to meet an equally low price of a competitor. Differences in price satisfying either of these tests are permitted by the terms of the Act.[9] It is argued that the Commission has radically broadened its prohibitory

---

[9] "[N]othing herein contained shall prevent differentials which make only due allowance for differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered. . . ." 49 Stat. 1526, 15 U. S. C. § 13 (a). "[N]othing herein contained shall prevent a seller rebutting the prima-facie case thus made by showing that his lower price . . . was made in good faith to meet an equally low price of a competitor . . . ." 49 Stat. 1526, 15 U. S. C. § 13 (b), *Standard Oil Co.* v. *Federal Trade Comm'n,* 340 U. S. 231 (1951). Ruberoid does not complain of the omission

powers through failure to include these provisos in the order. We do not think so because we think the provisos are necessarily implicit in every order issued under the authority of the Act, just as if the order set them out *in extenso*. Although previous Commission orders have included these provisos, they gained no force by that inclusion. Their absence cannot preclude the seller from differentiating in price in a new competitive situation involving different circumstances where it can justify the discrimination in accordance with the statutory provisos. Nor is the seller required to seek modification of the order each time, for example, that a competitor's price reduction requires it either to lower its price in good faith to meet the lower competing price or to lose a fleeting sales opportunity. On the other hand, the implied inclusion of the provisos in the order does not shift from the seller the burden of proof of justification.[10] Neither does recognition of the implicit availability of these defenses allow the seller to relitigate issues already settled by prior proceedings before the Commission which resulted in an order that was affirmed in the courts. If questions of justification, claimed upon the basis of facts relating to costs or meeting competition, have once been finally decided against the seller, it cannot again interpose the same defense upon substantially similar facts when the Commission seeks to show that its order has been violated.[11]

---

from the order of the statutory provisos relating to the seller's right to select its own customers and to price changes in response to changing conditions affecting the market for, or the marketability of, the goods concerned. Hence we do not deal with those defenses here.

[10] Cf. *Federal Trade Comm'n* v. *Morton Salt Co.*, 334 U. S. 37, 44–45 (1948) (cost justification); *Federal Trade Comm'n* v. *A. E. Staley Mfg. Co.*, 324 U. S. 746 (1945) (meeting-competition justification).

[11] Where the Commission seeks both affirmance and enforcement of its order in one proceeding, contending that the seller has con-

The same result follows where the evidence supporting the defense, although not produced in the previous proceedings, was then available to the seller. In short, the seller, in contesting enforcement or contempt proceedings, may plead only those facts constituting statutory justification which it has not had a previous opportunity to present.

The sole question presented by the Commission's petition concerns the lower court's holding, with one dissent, that the Commission could not "obtain a decree directing enforcement of an order issued under the Clayton Act in the absence of showing that a violation of the order has occurred or is imminent." [12] The pertinent parts of the Act provide:

> "If such person [subject to the order] fails or neglects to obey such order of the commission . . . while the same is in effect, the commission . . . may apply to the circuit court of appeals of the United States . . . for the enforcement of its order . . . . [T]he court . . . shall have power to make and enter . . . a decree affirming, modifying, or setting aside the order of the commission . . . .
>
> "Any party required by such order of the commission . . . to cease and desist from a violation charged may obtain a review of such order in said circuit court of appeals by filing in the court a written petition praying that the order of the commission . . . be set aside. . . . [T]he court shall have the same jurisdiction to affirm, set aside, or modify the order of the commission . . . as in the case of an applica-

---

tinued in its unlawful practices since the order was issued, the court, in deciding whether the order should be affirmed, will of course review the determination of the Commission in the ordinary manner. But questions thus settled will not be open in deciding whether the order has been violated and should therefore be enforced.

[12] 191 F. 2d 294, 295.

tion by the commission . . . for the enforcement of its order . . . .

"The jurisdiction of the circuit court of appeals of the United States to enforce, set aside, or modify orders of the commission . . . shall be exclusive." [13]

The Commission argues, first, that the provision authorizing it to apply for enforcement "if such person fails or neglects to obey such order" is merely "a Congressional directive to the Commission as to the circumstances under which it may go into court to seek enforcement," which does not amount to a prerequisite to the court's granting of enforcement.[14] We cannot subscribe to this argument, which disregards the unequivocal language of the statute and its consistent interpretation over the thirty-eight-year period of its existence.[15] Congress, in 1938, amended similar language in the Federal Trade Commission Act, so that the reviewing court is now plainly required, upon affirmance, to enforce an order based upon violation of that Act.[16] The Commission has

---

[13] 38 Stat. 735, as amended, 15 U. S. C. § 21.

[14] Brief for the Federal Trade Commission in No. 448, p. 16.

[15] *E. g., Federal Trade Comm'n* v. *Whitney & Co.,* 192 F. 2d 746 (C. A. 9th Cir. 1951); *Federal Trade Comm'n* v. *Standard Brands, Inc.,* 189 F. 2d 510 (C. A. 2d Cir. 1951); *Federal Trade Comm'n* v. *Herzog,* 150 F. 2d 450 (C. A. 2d Cir. 1945); *Federal Trade Comm'n* v. *Baltimore Paint & Color Works,* 41 F. 2d 474 (C. A. 4th Cir. 1930); *Federal Trade Comm'n* v. *Balme,* 23 F. 2d 615 (C. A. 2d Cir. 1928); *Federal Trade Comm'n* v. *Standard Education Society,* 14 F. 2d 947 (C. A. 7th Cir. 1926). The last three cases cited arose under the Federal Trade Commission Act, but since the Clayton Act provisions involved here are identical with the corresponding provisions of the Federal Trade Commission Act prior to 1938, 38 Stat. 720, the decisions make no distinction between them.

[16] "To the extent that the order of the Commission is affirmed, the court shall thereupon issue its own order commanding obedience to the terms of such order of the Commission." 52 Stat. 113, 15 U. S. C. § 45 (c). Unless the party subject to an order issued under the

repeatedly sought similar amendment of the Clayton Act provisions involved in this case.[17] We will not now achieve the same result by reinterpretation in the face of Congress' failure to pass the bills thus brought before it.[18] Effective enforcement of the Clayton Act by the Commission may be handicapped by the present provisions, but that is a question of policy for Congress.

Alternatively, the Commission argues that, even though disobedience of the order is a condition to enforcement upon the application of the Commission, there is no such condition where the order comes before the court upon petition for review by the affected party. This argument begins with the difference in language between the statutory paragraphs providing for review at the instance of the respective parties, but consideration of the section as a whole convinces us that the most that can be said for the argument is that the section is ambiguous. We think the statutory prerequisite to enforcement applies when the Commission seeks enforcement by cross-petition after review has been set in motion by the party subject to the order as well as when the Commission makes the original application.[19] There is no reason why one who has complied with the order, but who seeks to have it reviewed and modified or set aside, should be placed in a worse position than one who does not exercise that right. We

provisions of the Federal Trade Commission Act files a petition for review within sixty days, the order becomes final and its violation punishable. 52 Stat. 113–114, 15 U. S. C. § 45 (g) and (l).

[17] E. g., Ann. Rep. F. T. C. (1951) 7–8; Ann. Rep. F. T. C. (1948) 12; Ann. Rep. F. T. C. (1947) 13; Ann. Rep. F. T. C. (1946) 12.

[18] E. g., H. R. 10176, 75th Cong., 3d Sess.; H. R. 3402, 81st Cong., 1st Sess.

[19] Accord, e. g., Federal Trade Comm'n v. Fairyfoot Products Co., 94 F. 2d 844 (C. A. 7th Cir. 1938); Butterick Co. v. Federal Trade Comm'n, 4 F. 2d 910 (C. A. 2d Cir. 1925); L. B. Silver Co. v. Federal Trade Comm'n, 292 F. 752 (C. A. 6th Cir. 1923).

doubt that Congress intended its requirement for enforcement to depend entirely upon which party goes to court first.

*Affirmed.*

Mr. Justice Black concurs in the judgment and opinion of the Court, except that he thinks the Commission's order should expressly except from its prohibitions differentials which merely make allowances for differences in the cost of manufacture, sale, or delivery, or which are made in good faith to meet an equally low price of a competitor.

Mr. Justice Frankfurter, not having heard the argument, owing to illness, took no part in the disposition of this case.

Mr. Justice Douglas dissents from the denial of enforcement of the order.

Mr. Justice Jackson, dissenting in No. 504.

The Federal Trade Commission, in July of 1943, instituted before itself a proceeding against petitioner on a charge of discriminating in price between customers in violation of subsection (a) of § 2 of the Clayton Act as amended by the Robinson-Patman Act, approved June 19, 1936, 15 U. S. C. § 13 (a).

Several violations were proved and admitted to have occurred in 1941. No serious opposition was offered to an order to cease and desist from such discriminations, but petitioner did object to being ordered to cease types of violations it never had begun and asked that any order include a clause to the effect that it did not forbid the price differentials between customers which are expressly allowed by statute.

However, the Commission refused to include such a provision as "unnecessary to assure respondent [petitioner here] its full legal rights." It also rejected the specific and limited order recommended by its Examiner and substituted a sweeping general order to "cease and desist from discriminating in price: By selling such products of like grade and quality to any purchaser at prices lower than those granted other purchasers who in fact compete with the favored purchaser in the resale or distribution of such products." It wrote no opinion and gave only the most cryptic reasons in its findings.[1]

On proceedings for review, petitioner attacked this order for its indeterminateness and its prohibition of differentials allowed by statute. The Court of Appeals, however, affirmed, saying:

> "We sympathize with the petitioner's position and can realize the difficulties of conducting business under such general prohibitions. Nevertheless we are convinced that the cause of the trouble is the Act itself, which is vague and general in its wording and which cannot be translated with assurance into any detailed set of guiding yardsticks." [2]

This appraisal of the result of almost ten years of litigation exposes a grave deficiency either in the Act itself or in the administrative process by which it has been applied. Admitting that the statute is "vague and general in its wording," it does not follow that a cease and desist order implementing it should be. I think such an outcome of administrative proceedings is not acceptable. We would rectify and advance the administrative proc-

---

[1] A comprehensive study has pointed out the early failure of this Commission (and it applies as well to others) to clarify and develop the law and thereby avoid litigation by careful published opinions. Henderson, The Federal Trade Commission, 334.

[2] *Ruberoid Co.* v. *Federal Trade Commission,* 189 F. 2d 893, 894.

ess, which has become an indispensable adjunct to modern government, by returning this case to the Commission to perform its most useful function in administering an admittedly complicated Act.

If the Court of Appeals were correct, it would mean that the intercession of the administrative process between the Congress and the Court does nothing either to define petitioner's duties and liabilities or to impose sanctions. Congress might as well have declared, in these comprehensive terms, a duty not to discriminate and provided for prosecution of violations in the courts. That, of course, would impose on the courts the task of determining the meaning and application of the law to the facts. But that is just the task that this order imposes upon the courts in event of a contempt proceeding. The courts have derived no more detailed "guiding yardsticks" from the Commission than from Congress. On the contrary, the ultimate enforcement is further confused by the administrative proceeding, because it winds up with an order which literally forbids what the Act expressly allows and thus adds to the difficulty of eventual sanctions should they become necessary.

If the unsound result here were an isolated example of malaise in the administrative scheme, its tolerance by the Court would be less troubling, though no less wrong. But I think its decision may encourage a deterioration of the administrative process of which this case is symptomatic and which invites invasion of the independent agency administrative field by executive agencies. Other symptoms, betokening the same basic confusion, are the numerous occasions when administrative findings are inadequate for purposes of review and recent instances in which part of the government appears before us fighting another part—usually a wholly executive-controlled agency attacking one of the independent administrative agencies—the Departments of Agriculture (*Secretary of*

*Agriculture* v. *United States et al.*, No. 710, now pending in this Court) and Justice (*United States* v. *Interstate Commerce Commission*, 337 U. S. 426) against the Interstate Commerce Commission, the Department of Justice against the Maritime Commission (*Far East Conference* v. *United States*, 342 U. S. 570), the Secretary of the Interior against the Federal Power Commission (*United States ex rel. Chapman* v. *Federal Power Commission*, No. 658, now pending in this Court, certiorari granted 343 U. S. 941). Abstract propositions may not solve concrete cases, but, when basic confusion is responsible for a particular result, resort to the fundamental principles which determine the position of the administrative process in our system may help to illuminate the shortcomings of that result.

## I.

*The Act, like many regulatory measures, sketches a general outline which contemplates its completion and clarification by the administrative process before court review or enforcement.*

This section of the Act admittedly is complicated and vague in itself and even more so in its context. Indeed, the Court of Appeals seems to have thought it almost beyond understanding. By the Act, nothing is commanded to be done or omitted unconditionally, and no conduct or omission is *per se* punishable. The commercial discriminations which it forbids are those only which meet three statutory conditions and survive the test of five statutory provisos. To determine which of its overlapping and conflicting policies shall govern a particular case involves inquiry into grades and qualities of goods, discriminations and their economic effects on interstate commerce, competition between customers, the economic effect of price differentials to lessen competition or tend to create a monopoly, allowance for differences in cost of

manufacturing, sale or delivery and good faith in meeting of the price, services or facilities of competitors.

This Act exemplifies the complexity of the modern lawmaking task and a common technique for regulatory legislation. It is typical of instances where the Congress cannot itself make every choice between possible lines of policy. It must legislate in generalities and delegate the final detailed choices to some authority with considerable latitude to conform its orders to administrative as well as legislative policies.

The large importance that policy and expertise were expected to play in reducing this Act to "guiding yardsticks" is evidenced by the fact that authority to enforce the section is not confided to a single body for all industries but is dispersed among four administrative agencies which deal with special types of commerce besides the Federal Trade Commission.[3]

A seller may violate this section of the Act without guilty knowledge or intent and may unwittingly subject himself to a cease and desist order. But neither violation of the Act nor of the order will call for criminal sanctions; neither is even enforceable on behalf of the United States by injunction until after an administrative proceeding has resulted in a cease and desist order and it has been reviewed and affirmed, if review be sought, by the Court of Appeals. Only an enforcement order issued from the court carries public sanctions,[4] and its violation is punishable as a contempt.

---

[3] 15 U. S. C. § 21 vests enforcement in the Interstate Commerce Commission where applicable to certain regulated common carriers; in the Federal Communications Commission as to wire and radio communications; Civil Aeronautics Board as to air carriers; Federal Reserve Board as to banks, etc., and Federal Trade Commission as to all other types of commerce.

[4] 15 U. S. C. § 21.

Thus Congress, in this Act, has refrained from imposition of an unconditional duty directly enforceable by the government through civil or criminal proceedings in court, as it has in the Sherman Antitrust Act and the Wilson Tariff Act of 1894.[5]   It has carefully kept such cases as this out of the courts and has shielded a violator from any penalty until the administrative tribunal hands down a definitive order.   The difference is accented by another section of the Robinson-Patman Act which does make participation by any person in specified transactions which discriminate "to his knowledge" a criminal violation judicially punishable.[6]

It may help clarify the proper administrative function in such cases to think of the legislation as unfinished law which the administrative body must complete before it is ready for application.[7]   In a very real sense the legis-

---

[5] 15 U. S. C. §§ 1-4, 8, 9.

[6] 15 U. S. C. § 13a.

[7] For emphasis and appreciation of this concept of American administrative law and of the function of the administrative tribunal as we have evolved it, I am indebted to an unpublished treatise by Dr. Robert F. Weissenstein, whose Viennese and European background, education and practice gave him a perspective attained with difficulty by us who are so accustomed to our own process.

Lord Chancellor Herschell has employed a different but effective figure. "The truth is," said he, "the legislation is a skeleton piece of legislation left to be filled up in all its substantial and material particulars by the action of rules to be made by the Board of Trade.  . . . it was the intention of the Legislature, having expressed the general object, and having provided the necessary penalty, to leave the subordinate legislation, so to speak, to be carried out by the Board of Trade." *Institute of Patent Agents* v. *Lockwood,* [1894] A. C. 347, 356-357.

For an excellent study of English "Delegated Legislation Today" see Willis, Parliamentary Powers of English Government Departments, c. II, p. 47.  For the extent to which this system has been used in England, see Lord Macmillan, Local Government Law and Administration in England and Wales, Vol. I, Preface.

lation does not bring to a close the making of the law. The Congress is not able or willing to finish the task of prescribing a positive and precise legal right or duty by eliminating all further choice between policies, expediences or conflicting guides, and so leaves the rounding out of its command to another, smaller and specialized agency.

It is characteristic of such legislation that it does not undertake to declare an end result in particular cases but rather undertakes to control the processes in the administrator's mind by which he shall reach results. Because Congress cannot predetermine the weight and effect of the presence or absence of all of the competing considerations or conditions which should influence decisions regulating modern business, it attempts no more than to indicate generally the outside limits of the ultimate result and to set out matters about which the administrator must think when he is determining what within those confines the compulsion in a particular case is to be.

Such legislation does not confer on any of the parties in interest the right to a particular result, nor even to what we might think ought to be the correct one, but it gives them the right to a process for determining these rights and duties. *Montana-Dakota Utilities Co.* v. *Northwestern Public Service Co.*, 341 U. S. 246, 251; *Phelps Dodge Corp.* v. *Labor Board*, 313 U. S. 177, 194, 195.

Such legislation represents inchoate law in the sense that it does not lay down rules which call for immediate compliance on pain of punishment by judicial process. The intervention of another authority must mature and perfect an effective rule of conduct before one is subject to coercion. The statute, in order to rule any individual case, requires an additional exercise of discretion and that

last touch of selection which neither the primary legislator nor the reviewing court can supply. The only reason for the intervention of an administrative body is to exercise a grant of unexpended legislative power to weigh what the legislature wants weighed, to reduce conflicting abstract policies to a concrete net remainder of duty or right. Then, and then only, do we have a completed expression of the legislative will, in an administrative order which we may call a sort of secondary legislation, ready to be enforced by the courts.

## II.

*The constitutional independence of the administrative tribunal presupposes that it will perform the function of completing unfinished law.*

The rise of administrative bodies probably has been the most significant legal trend of the last century and perhaps more values today are affected by their decisions than by those of all the courts, review of administrative decisions apart. They also have begun to have important consequences on personal rights. Cf. *United States* v. *Spector,* 343 U. S. 169. They have become a veritable fourth branch of the Government, which has deranged our three-branch legal theories much as the concept of a fourth dimension unsettles our three-dimensional thinking.

Courts have differed in assigning a place to these seemingly necessary bodies in our constitutional system. Administrative agencies have been called quasi-legislative, quasi-executive or quasi-judicial, as the occasion required, in order to validate their functions within the separation-of-powers scheme of the Constitution. The mere retreat to the qualifying "quasi" is implicit with confession that all recognized classifications have broken

down, and "quasi" is a smooth cover which we draw over our confusion as we might use a counterpane to conceal a disordered bed.

The perfect example is the Federal Trade Commission itself. By the doctrine that it exercises legislative discretions as to policy in completing and perfecting the legislative process, it has escaped executive domination on the one hand and been exempted in large measure from judicial review on the other. If all it has to do is to order the literal statute faithfully executed, it would exercise a function confided exclusively to the President and would be subject to his control. Cf. *Myers* v. *United States,* 272 U. S. 52; U. S. Const., Art. II, §§ 1, 3. This Court saved it from executive domination only by recourse to the doctrine that "In administering the provisions of the statute in respect of 'unfair methods of competition'—that is to say in filling in and administering the details embodied by that general standard—the commission acts in part quasi-legislatively and in part quasi-judicially." *Humphrey's Executor* v. *United States,* 295 U. S. 602, 628.

When Congress enacts a statute that is complete in policy aspects and ready to be executed as law, Congress has recognized that enforcement is only an executive function and has yielded that duty to wholly executive agencies, even though determination of fact questions was necessary.[8] Examples of the creation of such rights

---

[8] The legislative history of the Fair Labor Standards Act, 29 U. S. C. § 201 *et seq.,* exemplifies the choice which Congress must make between itself completing the legislation, and delegating the completion to an administrative agency. H. R. Rep. No. 2738, 75th Cong., 3d Sess., sets forth a summary of both the House Bill and the Senate Bill. The Senate Bill provided for the creation of a Labor Standards Board composed of five members, which was empowered to declare from time to time, for such occupations as

and obligations are patent, revenue and customs laws. Only where the law is not yet clear of policy elements and therefore not ready for mere executive enforcement is it withdrawn from the executive department and confided to independent tribunals. If the tribunal to which such discretion is delegated does nothing but promulgate as its own decision the generalities of its statutory charter, the rationale for placing it beyond executive control is gone.

---

are brought within the bill, minimum wages "which shall be as nearly adequate as economically feasible without curtailing opportunity for employment, to maintain a minimum standard of living necessary for health, efficiency, and general well-being . . ." but not in excess of 40 cents per hour. *Id.*, at 15. Similar provisions empowered the Board to determine maximum hours, provided that in no case should the maximum be set at less than 40 hours. *Id.*, at 16. Likewise, the Board was empowered to require the elimination of substandard labor conditions. *Id.*, at 17.

The House Bill, on the other hand, itself laid down the minimum wage and maximum hour requirements, *id.*, 22–23, and gave to the Secretary of Labor discretion only to determine which industries were within the terms of the law, plus the power to investigate compliance with the law. *Id.*, at 23. The Act as ultimately adopted followed the House Bill; although there was created the office of Administrator of the Wage and Hour Division in the Department of Labor, the Administrator was given discretion only in minor matters relating to the applicability of the congressional standards. 52 Stat. 1060, 29 U. S. C. § 201 *et seq.*

The Administration favored the plan of delegating legislative discretion to an independent administrative body to apply general standards to concrete cases. See testimony of Secretary of Labor Frances Perkins, Joint Hearings before the Senate Committee on Education and Labor and the House Committee on Labor on S. 2475 and H. R. 7200, 75th Cong., 1st Sess. 178. However, the attempt of Congress itself to complete this complex law for enforcement by the Executive, through the courts, not only flooded the courts with litigation, but the courts' interpretation of the Act contrary to the policy which Congress thought it had indicated had disastrous consequences. 61 Stat. 84, 29 U. S. C. § 251 *et seq.*

### III.

*The quasi-legislative function of filling in blank spaces in regulatory legislation and reconciling conflicting policy standards must neither be passed on to the courts nor assumed by them.*

That the work of a Commission in translating an abstract statute into a concrete cease and desist order in large measure escapes judicial review because of its legislative character is an axiom of administrative law, as the Court's decision herein shows. In delegating the function of filling out the legislative will in particular cases, Congress must not leave the statute too empty of meaning. Courts look to its standards to see whether the Commission's result is within the prescribed terms of reference, whether the secondary legislation properly derives from the primary legislation.

Then, too, we look to administrative findings, not to reconsider their justification, but to learn whether the parties have had the process of determination to which the statute has entitled them and whether the Commission has thought about—or at least has written about— all factors which Congress directed it to consider in translating unfinished legislation into a "detailed set of guiding yardsticks" that becomes law of the case for parties and courts.[9]

However, a determination by an independent agency, with "quasi-legislative" discretion in its armory, has a

---

[9] If the independent agencies could realize how much trustworthiness judges give to workmanlike findings and opinions and how their causes are prejudiced on review by slipshod, imprecise findings and failure to elucidate by opinion the process by which ultimate determinations have been reached, their work and their score on review would doubtless improve. See Henderson, The Federal Trade Commission, c. VI, p. 327. See also Commission on Organization of the Executive Branch of the Government, Task Force Report on Regulatory Commissions (App. N), pp. 129–130.

much larger immunity from judicial review than does a determination by a purely executive agency. The court, in review of a case under the tax law or the patent law, where the legislative function has been exhausted and policy considerations are settled in the Acts themselves, follows the same mental operation as the executive officer. On the facts, there results an obligation to pay tax, or there is a right to a patent. The court can deduce these legal rights or obligations from the statute in the same manner as the executive officer. Hence, review of such executive decisions proceeds with no more deference to the administrative judgment than to a decision of a lower court.

Very different, however, is the review of the "quasi-legislative" decision. There the right or liability of the parties is not determined by mere application of statute to the facts. The right or obligation results not merely from the abstract expression of the will of Congress in the statute, but from the Commission's completion and concretization of that will in its order. Cf. *Montana-Dakota Co.* v. *Northwestern Public Service Co., supra,* 251; *Phelps Dodge Corp.* v. *Labor Board, supra.*

On review, the Court does not decide whether *the* correct determination has been reached. So far as the Court is concerned, a wide range of results may be equally correct. In review of such a decision, the Court does not at all follow the same mental processes as the Commission did in making it, for the judicial function excludes (in theory, at least) the policy-making or legislative element, which rightfully influences the Commission's judgment but over which judicial power does not extend. Since it is difficult for a court to determine from the record where quasi-legislative policy making has stopped and quasi-judicial application of policy has begun, the entire process escapes very penetrating scrutiny. Cf.

*Federal Power Commission* v. *Hope Natural Gas Co.,* 320 U. S. 591.

Courts are no better equipped to handle policy questions and no more empowered to exercise legislative discretion on contempt proceedings than on review proceedings. It is plain that, if the scheme of regulating complicated enterprises through unfinished legislation is to be just and effective, we must insist that the legislative function be performed and exhausted by the administrative body before the case is passed on to the courts.

## IV.

*This proceeding should be remanded for a more definitive and circumscribed order.*

Returning to this case, I cannot find that ten years of litigation have served any useful purpose whatever. No doubt it is administratively convenient to blanket an industry under a comprehensive prohibition in bulk—an undiscriminating prohibition of discrimination. But this not only fails to give the precision and concreteness of legal duties to the abstract policies of the Act, it really promulgates an inaccurate partial paraphrase of its indeterminate generalities. Instead of completing the legislation by an order which will clarify the petitioner's duty, it confounds confusion by literally ordering it to cease what the statute permits it to do.

This Court and the court below defer solution of the problems inherent in such an order, on the theory that if petitioner offends again there may be an enforcement order, and if it then offends again there may be a contempt proceeding and that will be time enough for the court to decide what the order against the background of the Act really means. While I think this less than justice, I am not greatly concerned about what the Court's decision does to this individual petitioner, for whom I foresee no danger more serious than endless litigation.

But I am concerned about what it does to administrative law.

To leave definition of the duties created by an order to a contempt proceeding is for the courts to end where they should begin. Injunctions are issued to be obeyed, even when justification to issue them may be debatable. *United States* v. *United Mine Workers*, 330 U. S. 258, 289 *et seq.*, 307. But in this case issues that seem far from frivolous as to what is forbidden are reserved for determination when punishment for disobedience is sought. The Court holds that some modifications are "implicit" in this order. Why should they not be made explicit? Why approve an order whose literal terms we know go beyond the authorization, on the theory that its excesses may be retracted if ever it needs enforcement? Why invite judicial indulgence toward violation by failure to be specific, positive and concrete?

It does not impress me as lawyerly practice to leave to a contempt proceeding the clarification of the reciprocal effects of this Act and order, and determination of the effect of statutory provisos which are then to be read into the order. The courts cannot and should not assume that function. It is, by our own doctrine, a legislative or "quasi-legislative" function, and the courts cannot take over the discretionary functions of the Commission which should enter into its determinations. Plainly this order is not in shape to enforce and does not become so by the Court's affirmance.

This proceeding should be remanded to the Commission with directions to make its order specific and concrete, to specify the types of discount which are forbidden and reserve to petitioner the rights which the statute allows it, unless they are deemed lost, forfeited or impaired by the violations, in which case any limitation should be set forth. The Commission should, in short, in the light of its own policy and the record, translate

this Act into a "set of guiding yardsticks," admittedly now lacking. If that cannot be done, there should be no judicial approval for an order to cease and desist from we don't know what.

If that were done, I should be inclined to accept the Government's argument that, along with affirmance, enforcement may be ordered. I see no real sense, when the case is already before the Court and is approved, in requiring one more violation before its obedience will be made mandatory on pain of contempt. But, as this order stands, I am not surprised that enforcement should be left to some later generation of judges.