406 A.2d 1355

In re Petition of John F. DWYER, Charles Sludden, Jr., Thomas A. Oravecz, Peter P. Petresky, Linda Zerbe, Howard Grabert and Louis Guzzi.

Supreme Court of Pennsylvania.

Oct. 19, 1979.

586

Arlen Specter, Philadelphia, Philadelphia County, for petitioners at No. 44 and for respondents at No. 45.

Edward C. German, Philip A. Ryan, Philadelphia, Philadelphia County, for petitioner at No. 45.

Robert Davis Gleason, Johnstown, for petitioner at No. 46 and for respondents at No. 45.

Nicholas A. Barna, Dist. Atty., for respondents in all three cases.

Richard A. Sprague, Philadelphia, Philadelphia County, for respondents at Nos. 44 and 45.

Stephen Jennings, Robert F. Jennings, Honesdale, Coroner, Wayne County, Stephen G. Bresset, Honesdale, Wayne County, for respondents at No. 46.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, NIX, MANDERINO, LARSEN and FLAHERTY, JJ.

## OPINION

LARSEN, Justice.

█ This is a case of first impression in this jurisdiction. It presents the issue of whether "quasi-judicial immunity"

insulates officials of a state agency from criminal liability and prosecution for the consequences of official agency acts alleged to have been performed by said officials in a wanton, reckless and grossly negligent manner where there are no allegations of corruption or bad faith in their conduct.

On September 15, 1977, a safety inspector for the Pennsylvania Department of Labor and Industry conducted an inspection of the Allen Motor Inn, a three-story structure in Honesdale, Wayne County, which revealed numerous violations, of varying degrees of seriousness, of the Fire and Panic Act, Act of April 27, 1927, P.L. 465, § 2, *as amended*, 35 P.S. §§ 1221–1235 (1977).[1] On November 10, 1977, the supervisor of the Wilkes-Barre District Office of the Bureau of Occupational and Industrial Safety (of the Department of Labor and Industry) issued Order No. 155–8–1977 to Mr. George Petto, owner of the Allen Motor Inn, outlining the various violations found and directing Mr. Petto to correct these violations within certain time periods, and ordering the second and third floors closed off until the corrections were made.

Between November 10, 1977 and March 29, 1978, attorneys for Mr. Petto requested three extensions of time for compliance with the November 10th order. These requests were in writing and were directed to the Industrial Board. The Industrial Board is an arm of the Department of Labor and Industry, *see* 71 P.S. §§ 155 and 574 (1962) and is charged with the responsibility of overseeing numerous matters affecting labor and industry in the Commonwealth. The Industrial Board consists of five members—the Secretary of Labor and Industry and four additional members, one of whom is an employer of labor, one a wage earner, and one a woman. *Id.* at § 155. The Industrial Board members are appointed by the Governor, with the advise and consent of the Senate, for a term of four years. Several Advisory

---

1. These violations included an absence of fire alarms, smoke detectors, emergency lighting and fire extinguishers, the absence of a night clerk or fire guard, accumulation of debris in the basement, inadequate fire doors and barriers, inadequate fire exits, the absence of a sprinkler system and a defective and non-certified boiler.

Boards make recommendations to the Industrial Board concerning matters within their particular areas of expertise.[2] These Advisory Boards are generally composed of experts in the given area in which they are advising. In matters concerning administration of the Fire and Panic Act, the Industrial Board is advised by members of the Building Advisory Board.

Mr. Petto's first application for extension of time for compliance stated that several deficiencies had been corrected and that time was needed to retain an engineering firm to prepare necessary plans and specifications to correct the other deficiencies. Reasons stated in subsequent applications cited various problems including family illness, harsh winter weather and the dissatisfaction with and dismissal of the engineering firm first retained by Mr. Petto. In each instance, the Building Advisory Board recommended that the applications be granted and the Industrial Board accepted said recommendations and, without hearings, granted the extensions for either 30 or 60 days.

On May 30, 1978, a request for a variance on certain height and structural limitations was made by Mr. Petto which request was conditionally granted by the Industrial Board on June 28, 1978. At that time, the Industrial Board advised Petto that "all other requirements of the Fire and Panic Regulations shall be met." On January 12, 1978 and again on February 17, 1978, the safety inspector reinspected the Allen Motor Inn and found only minimal compliance with the November 10th order. Reports of these inspections apparently had been sent to either the Building Advisory Board or the Industrial Board but there is a dispute as to whether the reports actually were in the Industrial Board's files when it decided the applications for extension of time.

On November 5, 1978, tragedy struck at the Allen Motor Inn. A fire broke out there on that day which took the lives of twelve tenants of the Inn. While the immediate cause of

2. For example, there is a Boiler Advisory Board, a Private Employment Advisory Board, and an Elevator Advisory Board.

the first appears to be arson,[3] it is not in dispute that the condition of the building and the numerous uncorrected violations of the Fire and Panic Act contributed to the rapid spread of the fire and the ensuing loss of lives.

The Coroner of Wayne County, Robert F. Jennings, respondent herein, convened a Coroner's inquest into the circumstances leading up to and surrounding the fire. On April 24, 1979, a Coroner's jury made a recommendation that the members of the Industrial Board and the Building Advisory Board, petitioners herein, be charged with involuntary manslaughter, Pa.Crimes Code, 18 Pa.C.S. § 2504 (1978), reckless endangerment of life, *id.* at § 3303, and criminal conspiracy, *id.* at § 903. These charges were asserted as a result of petitioners' alleged wanton, reckless and grossly negligent conduct in their administration of their duties with respect to the Fire and Panic Act. At no time was it asserted, nor is it now in respondent's brief, that petitioners' actions (or non-actions) were for improper or corrupt motives.

Petitioners now request this Court to exercise our extraordinary jurisdiction pursuant to 42 Pa.C.S. § 726 (Supp.1978–79) and our King's Bench Powers to resolve, *inter alia,* the question of the scope of the so-called doctrine of "quasi-judicial" immunity and its applicability to the circumstances of this case. Also requested is a writ of prohibition prohibiting respondent from pursuing his criminal prosecution of petitioners.

The question of judicial immunity from criminal prosecution has been considered by this Court in *McNair's Petition,* 324 Pa. 48, 187 A. 498 (1936). In *McNair's Petition,* a judge on the Court of Common Pleas of Allegheny County convened a grand jury to determine whether certain magistrates were guilty of malfeasance or misconduct in office and to report to the court whether indictments against the magistrates were recommended. The allegations were that these committing magistrates had "violated the law" by,

3. An individual has been arrested and charged with arson in the fire at the Allen Motor Inn.

*inter alia*, discharging certain persons for insufficient evidence, even though the persons allegedly had admitted their guilt, and by not requiring bail from other defendants who had been held for trial. The Common Pleas Judge was concerned with a failure of the magistrates to properly execute their duties and had no suspicion or reason to believe the magistrates were influenced by bribery or other corrupt motives.

*McNair's Petition* held:

"In certain instances [magistrate's] decisions are reviewable on appeal, but otherwise they must be left free to exercise an independent judgment in the conduct of their office. *They cannot be subject to liability, civil or criminal, for any of their judicial acts, no matter how erroneous, so long as they act in good faith.*" *Id.*, 324 Pa. at 55, 187 A. 498.

.[i]t is his [the magistrate's] discretion, his judgment, which must be exercised, for he is the officer entrusted by the law with the function of rendering a preliminary decision. In its performance he must be free from all external influences and, so long as he renders judgment in good faith, he is accountable to no one." *Id.*, 324 Pa. at 54, 187 A. 498.

In so stating, this Court sought to ensure the *independence* of the magistrates so that they may be free to exercise their discretion and apply their understanding of the law, whether correct or erroneous, to the facts and circumstances presented to them, unburdened by the threat of criminal prosecution for serious errors of judgment in that application. *See United States v. Chaplin*, 54 F.Supp. 926 (S.D.Cal.1944) (judges immune from criminal prosecution for acts performed in official capacity).

In the leading and often cited case on judicial immunity (albeit in the liability for civil damages area), *Bradley v. Fisher*, 13 Wall. 335, 80 U.S. 335, 20 L.Ed. 646 (1871), the United States Supreme Court eloquently stated:

For it is a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequences to himself. Liability to answer to every one who might feel himself aggrieved by the action of the judge, would be inconsistent with the possession of this freedom, and would destroy that independence without which no judiciary can be either respectable or useful. *Id.* at 80 U.S. 351.

■ The absolute need for an independent judiciary has not changed since *Bradley.* However, the modern era has ushered into our system of jurisprudence men and women who, in administrative agency proceedings, performed adjudicatory functions much the same as those performed by judges. These men and women are called upon to exercise their discretion in applying statutes, rules, and often case law governing the particular administrative agency area to the facts and circumstances of each proceeding. The question has recently arisen, as it has here, as to the propriety of adoption of a "quasi-judicial" immunity to preserve the independence of these administrative agency officials in rendering their decisions.[4]

The United States Supreme Court has addressed itself to this issue in the seminal case of *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978). That case concerned the personal immunity of various federal officials in the executive branch from claims for damages arising from their alleged violations of citizens' constitutional rights. The Department of Agriculture had instituted an administrative enforcement proceeding against a commodity futures

4. This case poses the threat of criminal prosecution against state agency officials for conduct performed in their official capacity although allegedly in a grossly negligent manner. Because of the grave implications of such a prosecution and the obvious potential chilling effect such prosecutions might have on all state agency officials in the performance of their duties, this matter is one of immediate public importance. We therefore find it appropriate to exercise extraordinary jurisdiction to resolve the issue. 42 Pa.C.S. § 726 (1978).

commission merchant to revoke or suspend that merchant's registration. The individual controlling the company which was registered as a futures merchant brought a civil action for damages against several officials of the Department, including the Secretary and Assistant Secretary of Agriculture, the Judicial Officer and Chief Hearing Examiner, the Department attorney who prosecuted the enforcement proceedings and several investigative auditors.

The United States Supreme Court held that those officials performing adjudicatory functions within an administrative agency perform a role "functionally comparable" to the role of a judge. For example, the hearing examiner may issue subpoenas, rule on proffers of evidence, regulate the course of the hearing, and make or recommend decisions. "We think that adjudication within a federal administrative agency shares enough of the characteristics of the judicial process that those who participate in such adjudication should also be [absolutely] immune from suits for damages." *Id.* at 512–13, 98 S.Ct. at 2914, 57 L.Ed.2d at 920. This quasi-judicial immunity, as the judicial immunity, is necessary to ensure that agency adjudicatory decisions will be rendered independently, free from external pressures, harassment or intimidation.

The Court went on to state that agency officials performing functions analogous to those of a prosecutor should also be able to claim absolute quasi-judicial immunity with respect to their official acts. The rationale is that the decision whether or not to initiate administrative proceedings against an individual or corporation is closely akin to the prosecutor's absolutely immunized decision to initiate or move forward with a criminal prosecution. (Judicial immunity has long been recognized as applicable to the criminal prosecutor. *Yaselli v. Goff*, 275 U.S. 503, 48 S.Ct. 155, 72 L.Ed. 395 (1927), *aff'g.* 12 F.2d 396 (2nd Cir. 1926).) The Court reasoned that the "discretion which executive officials exercise with respect to the initiation of administrative proceedings might be distorted if their immunity from damages arising from that decision was less than complete." 438 U.S. at 515, 98 S.Ct. at 2915, 57 L.Ed.2d at 921.

We adopt the principle, as enunciated in *Butz*, of quasi-judicial immunity for agency officials. The Industrial Board is the body charged with the administration of the Fire and Panic Act. *See* 35 P.S. §§ 1221–1235 (1977) *and* 34 Pa.Code Part I, ch. 37, §§ 37.701–.710. The Board is empowered to hold hearings, issue subpoenas and administer oaths. *See* 71 P.S. §§ 155 and 1442. For actual enforcement of its final orders for compliance, the Board must resort to the courts. 34 Pa.Code § 37.709.

The general rules of administrative practice and procedure embodied in 1 Pa.Code Part II are applicable to proceedings for the enforcement of the Fire and Panic Act. 34 Pa.Code § 37.701. In the execution of its duties, the Industrial Board is advised by the Buildings Advisory Board in matters pertaining to the Fire and Panic Act—the function of this Board is strictly advisory, although, in practice, their recommendations are often followed.

The regulations of the Pennsylvania Code specifically provide for the discretionary granting of extensions, and of variances. The statutes and the Code contemplate exercise of agency discretion in the granting of extensions and variances and in the decision whether to initiate enforcement proceedings in a court of competent jurisdiction.[5] *See Commonwealth v. Durbin*, 24 Pa.Cmwlth. 58, 354 A.2d 24

---

**5.** 34 Pa.Code § 31.15 provides, in relevant part:

(1) Except as otherwise provided by law, whenever by these rules or by any regulation or order of an agency . . . an act is required . . . to be done at or within a specified time, the time fixed or the period of time prescribed may, by the agency head or the presiding officer, for good cause be extended upon motion made before expiration of the period originally prescribed or as previously extended; and upon motion made after the expiration of the specified period, the act may be permitted to be done where reasonable grounds are shown for the failure to act. (2)(b) . . . requests for extensions of time . . . shall be by motion in writing, timely filed with the agency, stating the facts on which the application rests. . . .

*See* 34 Pa.Code §§ 1.11 and 37.701 (making § 31.15 applicable to the proceedings of the Industrial Board for enforcement of the Fire and Panic Act).

34 Pa.Code § 37.705 provides that answers may be filed to orders to show cause issued by the Industrial Board, and requests for variances may be made.

(1976). These discretionary decisions are exercised by the application of standards, rules and regulations to the conditions and circumstances of the particular case.

■ Applying the principle of quasi-judicial immunity to the present case, we find that the petitioners are quasi-judicial and/or quasi-prosecutorial officers, that the proceedings at which the extensions and variance were granted were quasi-judicial, and that, therefore, in the absence of allegations of bad faith or corruption, the petitioners, in granting the extensions and variance, are insulated from criminal prosecution for the consequences of their actions.

■ Respondent argues that, even if this Court adopts the principle of quasi-judicial immunity, that principle should not be applied in the instant case because the extensions and variance were granted *ex parte*, without adversary hearing or formal adjudicatory proceedings. We disagree.

■ In deciding that the role of officials of an administrative agency such as the Department of Agriculture are functionally equivalent to the role of the judiciary, *Butz* looked to the presence and exercise of discretionary decision-making authority (i. e., applying the law, rules and regulations to the factual matrix of a given case) as well as the existence of procedural safeguards in the administrative proceeding similar to the safeguards afforded at a judicial proceeding (e. g., notice, hearing, right to cross-examine witnesses, etc.). While the existence of these procedural safeguards is a valuable indicator that an agency's role is comparable to that of the judiciary, it is not a *sine qua non.* The primary emphasis seemed to be placed on a decision-maker's ability to freely exercise his discretion without harassment or intimidation by disappointed parties. *See* 438 U.S. 508–12, 98 S.Ct. 2911, 2914, 57 L.Ed.2d 917–19; *accord, Merchants Warehouse Co. v. Gelder*, 349 Pa. 1, 36 A.2d 444 (1944).

This emphasis is also seen in *Stump v. Sparkman*, 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978). In *Stump*, a judge of the Circuit Court of Dekalb County, Illinois was presented

with a "Petition to Have Tubal Ligation Performed on Minor." This petition of the minor's mother stated that the minor, her daughter, was "somewhat retarded" and requested judicial approval of an operation which would sterilize the minor. The petition was approved *ex parte* on the day it was presented, and the operation was "successfully" performed. The minor was told she was having her appendix removed. When she discovered in 1971, after marrying, that she had had a tubal ligation, and thus was unable to conceive children she and her husband sued, among others, Judge Stump, seeking damages for alleged violation of her constitutional rights.

The Supreme Court of the United States held Judge Stump immune from suit. "A judge will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority; rather, he will be subject to liability only when he has acted in the 'clear absence of all jurisdiction.' " *Id.* at 356–57, 98 S.Ct. at 1105, 55 L.Ed.2d at 339, *citing Bradley v. Fisher, supra* 13 Wall. at 351, 80 U.S. at 351.

Further, this immunity is not lost even when the judicial exercise of authority is flawed by "grave procedural errors." The plaintiffs in *Stump* argued that Judge Stump's approval of the petition was not a judicial act because the petition was not docketed or placed on file with the clerk of courts, and that approval was made in an *ex parte* proceeding without notice to the minor, without a hearing, and without the appointment of a guardian ad litem. The Court rejected the argument that the absence of procedural safeguards rendered the act a non-judicial one, stating "the factors determining whether an act by a judge is a "judicial" one relate to the nature of the act itself, i. e., whether it is a function normally performed by a judge, and to the expectations of the parties, i. e., whether they dealt with the judge in his judicial capacity." *Id.* at 362, 98 S.Ct. at 1107, 55 L.Ed.2d at 342. "Because Judge Stump performed the type of act normally performed only by judges [i. e., granting of a petition] and because he did so in his capacity as a Circuit

Court Judge, we find no merit to respondent's argument that the informality with which he proceeded rendered his action nonjudicial and deprived him of his absolute immunity." *Id.* at 362–63, 98 S.Ct. at 1108, 55 L.Ed.2d at 343.

Similarly in the instant proceeding, petitioners, in granting the extensions and the variance, were acting in their quasi-judicial capacity. They exercised discretion which they are authorized to do. That formal adjudicatory procedures were not followed is not determinative in our consideration of the immunity afforded their actions.

■ This opinion in no way condones reckless and negligent conduct of public officials in the performance of their responsibilities and duties. Criminal prosecution for that type of performance cannot, however, be the remedy.[6] Judges made timid because of fear of criminal prosecutions for errors in their decisions make poor public servants. History has borne out the fact that the only way judicial functions can be independently performed in the manner required in a democracy is to clothe "judicial performers" with this immunity.

The petition for extraordinary jurisdiction is granted, the criminal proceedings dismissed, and defendants-petitioners are discharged.

ROBERTS, J., filed a concurring opinion.

NIX, J., filed a dissenting opinion.

ROBERTS, Justice, concurring.

Shocking, indeed, are the allegations of incompetency and negligence of the Industrial Board of the Department of Labor and Industry, and the Board's Building Advisory Committee. Astonishing are the repeated instances of flagrant abuse of discretion alleged in this record. Neverthe-

---

**6.** We note that official behavior involving crimes of corruption such as bribery, extortion, public office crimes, (*see* Pa.Crimes Code, 18 Pa.C.S. §§ 4501, 4701, 4901, 5101, 5301), *crimen falsi*, conspiracy to commit crimes, etc., are not protected by judicial or quasi-judicial immunity. Additionally, public officers who are derelict in their duties can be removed from office by the appointing power.

less, the record clearly establishes that these agencies were performing a quasi-judicial function, and therefore there is no basis for criminal prosecution of their members. Moreover, the claimed abuses could have and should have been challenged by resort to existing administrative procedures and judicial review.[1] Failure to pursue these remedies offers no justification for resort to criminal sanctions.

More than twenty-five years ago, Justice Jackson wrote that the "rise of administrative bodies probably has been the most significant legal trend of the last century . . . ." *F.T.C. v. Rubberoid*, 343 U.S. 470, 487, 72 S.Ct. 800, 810, 96 L.Ed. 1081, 1094 (1952) (dissenting opinion). This trend has continued and accelerated. State and federal administrative agencies adjudicate, in constantly increasing numbers, controversies formerly decided by the judicial branch of government.

The exercise of discretion is a prime function of administrative agencies' adjudicative role. As Professor Davis has recently written:

> "Discretionary power is indispensable whenever individualizing is needed. Rules without discretion cannot satisfy the need for tailoring results to unique facts and circumstances of particular cases." [2]

Agencies' fair and expert tailoring of legislative mandates to individual circumstances, and their potential for expeditious disposition, is responsible for the growth and ever increasing importance of administrative tribunals in the resolution of disputes.

Of course, fundamental as discretion is to proper administrative adjudication, so too is judicial review of agency

---

1. 1 Pa.Code §§ 35.1 et seq. provides for review of administrative agency action. See especially § 35.231 (reopening matters); § 35.28 (intervention); see also 34 Pa.Code §§ 37.701–.710 (enforcement of the Fire and Panic Act); Administrative Agency Law, Act of June 4, 1945, P.L. 1388, §§ 1 et seq., 71 P.S. §§ 1710.1 et seq. (repealed by Act of April 28, 1978, P.L. 202, § 2(a), effective June 27, 1978) (in effect at the time of most of the events which form the basis of this case).

2. Kenneth C. Davis, *Administrative Law Treatise* § 8.3 (1979).

conduct. See James O. Freedman, *Crisis and Legitimacy* 243–55 (1978). Courts, in the proper exercise of judicial review, however, must be wary of undue intrusion into the administrative process which could discourage or chill the exercise of discretion by administrative agencies. Excessive judicial interference will result in administrative agencies reluctant to exercise discretion, and thus will defeat a fundamental objective of administrative agencies. It is the proper function of the judiciary, then, when reviewing agency conduct, to correct administrative abuse, and yet not discourage agencies from acting effectively.

It must be apparent that correction of administrative abuse by use of criminal prosecution would so chill agencies' exercise of discretion, that agencies would be deterred from the vigorous and effective performance of independent and just decisionmaking. As Dean Freedman has observed:

> "[T]he quality of administrative justice—the fairness of an agency's procedures, its interest in the protection of individual rights, its commitment to just results—is an essential source of administrative legitimacy." [3]

Permitting criminal prosecution in these circumstances would frustrate the Legislature's objectives in establishing administrative agencies. Failure to pursue established administrative and judicial review procedures for challenging claimed adjudicative deficiencies provides no basis for resort to criminal sanctions. The criminal law is not a permissible substitute for established administrative and judicial review procedures.

In light of all of these considerations, this Court properly exercises extraordinary jurisdiction and discharges the petitioners.

NIX, Justice, dissenting.

I must register my dissent to the majority's decision in this matter, first because it is procedurally unsound, and second, because it establishes precedent in a difficult area

---

**3.** James O. Freedman, *Crisis and Legitimacy* 11 (1978).

with only a superficial consideration of the problems involved therein.

The inappropriateness of a Writ of Prohibition in the instant case is obvious. A Writ of Prohibition is not a proceeding between private litigants, but rather, it is a vehicle by which a superior tribunal may restrain an inferior tribunal, over which it has superintendence, from exceeding its desegregated jurisdiction. *Carpentertown Coal and Coke Co. v. Laird*, 360 Pa. 94, 61 A.2d 426 (1948). See also *In re Reyes*, 476 Pa. 59, 381 A.2d 865 (1977); *Pirillo v. Takiff*, 462 Pa. 511, 341 A.2d 896 (1975); *McNair's Petition*, 324 Pa. 48, 187 A. 498 (1936).[1] Moreover, it has long been recognized that the "writ of prohibition is one which, like all other prerogative writs, is to be used only with great caution and forebearance and as an extraordinary remedy in cases of extreme necessity, to secure order and regularity in judicial proceedings if none of the ordinary remedies provided by law is applicable or adequate to afford relief." *Carpentertown Coal and Coke Co. v. Laird*, 360 Pa. at 102, 61 A.2d at 430.

The power and the duty of the coroner to investigate any death suspected of being caused by a criminal agency, and to inquire into who might be culpable for the death, has existed in our law from 4 Edward 1 Stat. 2. A.D. 1276. *Commonwealth v. Guy*, 41 D. & C.2d 151 (1966).[2] It is clear that the coroner is this case was acting pursuant to the responsibility entrusted to that office. Thus there was no showing of an absence of jurisdiction that would provide a basis for the issuance of the requested writ, even if it is determined that

1. "Its functions is to restrain or prohibit an offending court from continuing its unwarranted conduct when continuation threatens imminent harm to the individual on whose behalf the writ is issued." Comment, "The Writ of Prohibition in Pennsylvania, 80 Dick L.Rev. 472, 472–73 (1976). (footnotes omitted.)

2. In this opinion, Judge Aldisert, who is now a member of the Court of Appeals for the Third Circuit, provided a scholarly review of the power of the coroner from early English Law. In conclusion, he observed: "It, therefore, appears that the coroner has had the power and duty of a committing magistrate for at least 689 years, and probably longer." *Commonwealth v. Guy*, supra at 160.

the coroner was in error in the exercise of his discretion in the matter. The traditional review procedures are designed to correct such an error, if it in fact occurred.

In the alternative, the petitioners have requested this Court to invoke its extraordinary jurisdiction because of the asserted importance of the question raised. 42 Pa.C.S.A. § 726. There is no concern in this case that the issue would escape review if the regular process is followed or that an immediate review by this Court is required to avoid irreparable injury or injustice to the petitioners. Moreover, while the question presented the applicability of the doctrine of quasi-judicial immunity to the instant facts may well be of public interest, I fail to perceive the immediate need for our consideration which would justify the assumption of jurisdiction under this section. *Wilson v. Blake*, 475 Pa. 627, 381 A.2d 450 (1977); *Citizens Committee v. Board of Elections*, 470 Pa. 1, 367 A.2d 232 (1976); *Commonwealth v. Ryan*, 459 Pa. 148, 327 A.2d 351 (1974). Even if I were to accept, for the sake of argument, that the concern was one of *immediate* public importance, this Court has previously recognized:

> The presence of an issue of immediate public importance is not alone sufficient to justify extraordinary relief. As in requests for writs of prohibition and mandamus, we will not invoke extraordinary jurisdiction unless the record clearly demonstrates a petitioner's rights. Even a clear showing that a petitioner is aggrieved does not assure that this Court will exercise its discretion to grant the requested relief. (Citation omitted.) *Philadelphia Newspapers, Inc. v. Jerome*, 478 Pa. 484, 494 n. 11, 387 A.2d 425, 430 n. 11 (1978).

Finally, I cannot agree that the petitioners' right to immunity is as clear as the opinion of the majority suggests. *Philadelphia Newspapers, Inc. v. Jerome*, supra. I find it difficult to understand the majority's hasty acceptance of an unprecedented status immunity for criminal conduct of quasi-judicial bodies, particularly in light of this Court's most

recent general condemnation of status immunities. *Dubree v. Commonwealth*, 481 Pa. 540, 393 A.2d 293 (1978).[3]

Where, but for the defendant's status, a right of action would lie under analogous rules of law and no public policy would be promoted in shielding a defendant from liability, and the plaintiff has not failed to pursue existing remedies, denial of the possibility of recovery is unjustified. (Citations omitted.) *Dubree v. Commonwealth*, 481 Pa. at 546, 393 A.2d at 296.

If this argument is valid as to civil liability, it must of necessity have even greater impact where criminal responsibility is in question. The only public policy argument offered by the majority in support of immunity is the need for these officers to have an unfettered discretion in the performance of their duties. Yet, the teaching of *Dubree* is that immunity should not flow automatically from the status, but rather, as a consequence of a case by case analysis. No such analysis was employed by the majority in reaching their conclusion that petitioners were entitled to immunity.

The majority seeks support for its finding of immunity from criminal prosecution from the United States Supreme Court's decision in *Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978). This reliance completely ignores that *Butz* was concerned with *civil* and not *criminal* liability. Further, it ignores the U. S. Supreme Court's express rejection of immunity from criminal conduct. *O'Shea v. Littleton*, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974); *U. S. v. Lee*, 106 U.S. 196, 1 S.Ct. 240, 27 L.Ed. 171 (1882); *Ex parte Virginia*, 100 U.S. 399, 25 L.Ed. 676 (1879).

Whatever may be the case with respect to civil liability generally, see *Pierson v. Ray*, 386 U.S. 547, [87 S.Ct. 1213, 18 L.Ed.2d 288] (1967), or civil liability for willful corruption, see *Alzua v. Johnson*, 231 U.S. 106, 110–111, [34 S.Ct. 27, 28, 58 L.Ed. 142] (1913); *Bradley v. Fisher*, 13 Wall. 335, 347, 350, 354, [20 L.Ed. 646] (1872), we have never

**3.** This writer dissented in *Dubree v. Commonwealth*, 481 Pa. 540, 551, 393 A.2d 293, 296 (1978).

held that the performance of the duties of judicial, legislative, or executive officers, requires or contemplates the immunization of otherwise criminal deprivations of constitutional rights. Cf. *Ex parte Virginia*, 100 U.S. 339, [25 L.Ed. 676] (1880). On the contrary, the judicially fashioned doctrine of official immunity does not reach "so far as to immunize criminal conduct proscribed by an Act of Congress . . . ." *Gravel v. United States*, 408 U.S. 606, 627, [92 S.Ct. 2614, 2628, 33 L.Ed.2d 583] (1972). *O'Shea v. Littleton*, supra at 503, 94 S.Ct. at 680.[4]

While I do not intend to explore the question at length, the preceding discussion is sufficient to *illustrate* the majority's superficial treatment of a difficult issue which should not have been considered in this procedural posture. Unquestionably, the right of the petitioners was not so obvious as to justify the invocation of our king's bench powers to intercede in the proceedings at this point.

In conclusion, I perceive the threshold question as being whether there are any pressing reasons for prematurely interrupting the trial level proceedings and subjecting this issue to appellate consideration *at this juncture*. At the trial level, the instant objections and any others that may arise can be fully litigated, and possibly resolved in favor of these petitioners.[5] I wish to emphasize that I do not intend

4. I concede that this Court's decision in *McNair's Petition*, 324 Pa. 48, 187 A. 496 (1936), does give some support to the view that judicial immunity in this jurisdiction may immunize the judicial officer from criminal conduct, so long as the officer was acting in good faith. However, this decision offers no authority for extending that protection to quasi-judicial officers. Further, the validity of the *McNair* holding is in question in light of our recent decision in *Dubree v. Commonwealth*, supra.

5. It should be noted that petitioners at this point have not had a preliminary hearing, or an indictment or information issued against them. Remedies such as habeas corpus and motions to quash or dismiss were clearly available to allow this objection to be raised and considered *before the petitioners would have been exposed to trial.* Following the normal proceeding would have insured that if the question was ultimately brought to this Court for resolution, then we would have had the benefit of the thinking of the court below and the

to suggest approval of the action taken by the coroner in this case. To the contrary, I have difficulty in accepting that the coroner's findings establish the requisite causal relationship for criminal responsibility for the unfortunate deaths in this case. *See* 18 Pa.C.S.A. § 303; *Commonwealth v. Stafford*, 451 Pa. 95, 97, 301 A.2d 600 (1973); *Commonwealth v. Root*, 403 Pa. 571, 170 A.2d 310 (1961) (the act of the culprits must constitute a direct and substantial factor in causing the deaths). Nevertheless, it is abundantly clear that there is an absence of any exceptional circumstances demanding our intervention at this stage. The petition should have been dismissed.

refinement of the issues that the traditional appellate process is designed to provide.