OPINION
{¶ 1} In July 2001, the Ohio State Board of Psychology ("Board") received a complaint against appellant, George E. Serednesky, from Client G, alleging an improper non-sexual dual relationship. In June and July 2002, an investigator for the Board, Kelli Coleman Delguzzo, interviewed appellant by phone to discuss the complaint. An informal meeting was held on October 18, 2002, and in March 2003, the Board issued a Notice of Opportunity for Hearing letter, alleging appellant had violated provisions of R.C. Chapter 4732 and the rules governing the practice of psychology. Appellant requested a hearing, and the Board withdrew its initial notice and issued a new Notice of Opportunity for Hearing with new charges. A dispute arose regarding the hearing and the new charges, but was resolved and after a hearing, the Board found appellant had violated various provisions and issued an order permanently revoking his license, with a possibility of restoration after a minimum of three years. Appellant appealed to the common pleas court, which affirmed the Board's order.
 {¶ 2} Appellant appeals, raising the following assignments of error:
 ASSIGNMENT OF ERROR NO. 1.
The trial court erred in finding that the Board's statutes and rules were not unconstitutionally vague.
 ASSIGNMENT OF ERROR NO. 2.
The trial court erred in finding that participation of "patient advocates" in the adjudicative hearing was consistent with due process.
 ASSIGNMENT OF ERROR NO. 3.
The trial court erred in finding that testimony inferring that Appellant failed to cooperate with the Board's investigation was properly admitted.
 ASSIGNMENT OF ERROR NO. 4.
The trial court erred in finding that the Board's refusal to provide investigative materials to Dr. Serednesky was consistent with due process.
 ASSIGNMENT OF ERROR NO. 5.
The trial court erred and abused its discretion in finding that the Board's Order was based upon reliable, probative and substantial evidence.
 {¶ 3} R.C. 119.12 provides the standard of review for the common pleas court, as follows:
The court may affirm the order of the agency complained of in the appeal if it finds, upon consideration of the entire record and such additional evidence as the court has admitted, that the order is supported by reliable, probative, and substantial evidence and is in accordance with law. In the absence of such a finding, it may reverse, vacate, or modify the order or make such other ruling as is supported by reliable, probative, and substantial evidence and is in accordance with law. * * *
 {¶ 4} Even though the common pleas court must give due deference to the administrative agency's resolution of evidentiary conflicts, the findings of the agency are not conclusive. Univ. of Cincinnati v. Conrad (1980),63 Ohio St.2d 108, 111.
 {¶ 5} In Lorain City Bd. of Edn. v. State Emp. RelationsBd. (1988), 40 Ohio St.3d 257, 260-261, the Ohio Supreme Court set forth the standard of review for an appellate court as follows:
In reviewing an order of an administrative agency, an appellate court's role is more limited than that of a trial court reviewing the same order. It is incumbent on the trial court to examine the evidence. Such is not the charge of the appellate court. The appellate court is to determine only if the trial court has abused its discretion. An abuse of discretion "* * * implies not merely error of judgment, but perversity of will, passion, prejudice, partiality, or moral delinquency." State, ex rel.Commercial Lovelace Motor Freight, Inc., v. Lancaster (1986),22 Ohio St.3d 191, 193 * * *. Absent an abuse of discretion on the part of the trial court, a court of appeals must affirm the trial court's judgment. See Rohde v. Farmer (1970), 23 Ohio St.2d 82
* * *.
The fact that the court of appeals, or this court, might have arrived at a different conclusion than did the administrative agency is immaterial. Appellate courts must not substitute their judgment for those of an administrative agency or a trial court absent the approved criteria for doing so.
 {¶ 6} On questions of law, however, the common pleas court does not exercise discretion and the court of appeals review is plenary. Univ. Hosp., Univ. of Cincinnati College of Medicine v.State Emp. Relations Bd. (1992), 63 Ohio St.3d 339, paragraph one of the syllabus.
 {¶ 7} By the first assignment of error, appellant contends that the common pleas court erred in finding that the Board's statutes and rules were not unconstitutionally vague. Appellant argues that the statutes and rules upon which the violations and Notice of Opportunity for Hearing are based are so vague that they are constitutionally invalid.
 {¶ 8} In its order, the Board found that appellant had violated R.C. 4732.17(A)(5) and (7); (E); (G) and Ohio Adm. Code4732-17-01(E)(2)(a); (C)(3)(4); (B)(1); (J)(3); and 4732-13-04(B)(16); (C)(12). The conduct at issue involves a non-sexual dual relationship and splitting fees with Client G and failure to adequately document his supervision of psychology assistants.
 {¶ 9} At the hearing, appellant testified that he owns a counseling center named the Child and Adult Guidance Center. Client G became a patient of the Child and Adult Guidance Center beginning in 1988, but did not begin treating with appellant until 1993. (Tr. at 40-49.) The therapy was related to employment issues and ended in 1997 when Client G retired from her job. Client G contacted him in June 1999 on a social visit and informed him that she was unemployed. He offered her a job as his office manager and she worked for him until June 2001, when he fired her for poor work performance.
 {¶ 10} Client G testified that she first went to appellant's office in 1970 when she was fifteen because she had a rash on her legs from nerves after her father died. She testified that she was prescribed medication for her nerves at that time, but not by appellant. (Tr. at 316; 358.) Appellant was not licensed until 1974. (Tr. at 40.)
 {¶ 11} In June 1999, Client G called appellant and she testified that her purpose in calling him was for therapy. Appellant offered her a job as his office manager and she began working for him.
 {¶ 12} In February 2000, Client G was robbed at gunpoint. Appellant testified that Client G requested therapy but she insisted it occur at that location because she had transportation problems. He made an arrangement for Charlie Paugh, his supervisee, to provide therapy for her. He thought he suggested she seek treatment elsewhere but she refused. He also referred her to an attorney and had several discussions with Paugh and Client G concerning the parameters of the therapy. Client G testified that immediately after the robbery, she called appellant and he replied, "I can tell you how we can make some money out of this when you get to work tomorrow." (Tr. at 329.) Appellant told her she qualified for the Victims of Crime Program ("VOC") and he suggested that Paugh provide counseling and he would split the VOC reimbursement with her. (Tr. at 330-331.) She testified that they had several discussions before the therapy started regarding how the therapy would work and appellant referred her to an attorney, but he never offered to refer her to another counseling agency. (Tr. at 332-334.) The therapy ended in December 2000. Client G testified that appellant gave her $1,000 from the VOC reimbursement.
 {¶ 13} Appellant testified that Client G's work productivity began to decline in the spring of 2001, with attendance issues, trouble keeping current with the billing, errors and interpersonal problems with staff members. (Tr. at 70-71.) Appellant testified that Michelle Aulisio resigned because she felt intimidated and unsafe working with Client G. (Tr. at 73-74.) Appellant fired Client G on June 26, 2001.
 {¶ 14} Appellant argues that the Board's statutes and rules are unconstitutionally vague and that he was charged with statutes that were no longer in effect when the conduct in question occurred. The dual relationship violation was based on R.C. 4732.17(E) and (G), which was in effect in 1996, and O.A.C. 4732-17-01(E)(2)(a). R.C. 4732.17(E) and (G) in 1996 provided, as follows:
The state board of psychology may refuse to issue a license to any applicant, may issue a reprimand, or suspend or revoke the license of any licensed psychologist or licensed school psychologist, on any of the following grounds:
* * *
(E) Being negligent in the practice of psychology or school psychology;
* * *
(G) Violating any rule of professional conduct promulgated by the board[.][1]
 {¶ 15} O.A.C. 4732-17-01(E)(2)(a) in 1996 provided, as follows:
Impaired objectivity and dual relationships:
* * *
(2) Multiple relationships affecting psychologist's or school psychologists judgment. A psychologist or school psychologist should avoid multiple relationships with any client which might impair professional judgment or increase the risk of client exploitation. He/she shall not undertake or continue a professional relationship with a client, supervisee, or student where the objectivity or competency of the psychologist or school psychologist is or could reasonably be expected to be impaired or where the relationship with the client, supervisee or student is exploitative. The psychologist or school psychologist should be particularly aware that familial, social, emotional, financial, supervisory, political, administrative, or legal relationships with a client or a person related to or associated with the client must be carefully considered to insure that impaired judgment or exploitation is not involved. For purposes of this rule:
(a) Psychologists and school psychologists must always be sensitive to the potentially harmful effects of other contacts on their work and on those persons with whom they deal. A psychologist or school psychologist refrains from entering into or promising another personal, scientific, professional, or other relationship with such persons if it appears likely that such a relationship reasonably might impair the psychologist's or school psychologist's objectivity or otherwise interfere with the psychologist or school psychologist effectively performing his/her functions as a psychologist or school psychologist or might harm or exploit the other party.[2]
 {¶ 16} In United States v. Harriss (1954), 347 U.S. 612,617, the court stated the standard to be followed in determining whether a statute is impermissibly vague or indefinite, as follows: "The constitutional requirement of definiteness is violated by a criminal statute that fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute." A statute or ordinance is not necessarily void for vagueness because it could have been more precisely worded. Roth v. United States (1957), 354 U.S. 476,491. Since this case involves administrative regulations not a criminal statute, the regulations do not require the necessary specificity of a criminal statute. Salem v. Liquor ControlComm. (1973), 34 Ohio St.2d 244, 246. Thus, a regulation must provide a person of ordinary intelligence fair notice of the prohibited conduct.
 {¶ 17} The regulations in this case do not prohibit dual relationships between the psychologist and the client. O.A.C. 4732-17-01(E)(2) provides that the psychologist "should avoid" multiple relationships if they might impair professional judgment or increase the risk of client exploitation. Appellant testified that he carefully considered the situation before he hired Client G as an office manager and again carefully considered the situation before providing therapy after she was robbed and determined that the rules did not prohibit the relationships. The regulation is vague in that it does not provide a person of ordinary intelligence notice of what conduct is prohibited, but, rather, indicates that a psychologist "should avoid" multiple relationships.
 {¶ 18} Appellant also argues, in addition to the vague regulation, that he was charged with provisions which were not in effect at the time of the violations and the order should be invalidated. The versions of the regulations which appellant was charged were in effect until 1996, but the conduct at issue occurred after 1996. Appellant did not object at the hearing. However, the correct versions of the regulations, while numbered differently, still provide virtually the same language and appellant has not demonstrated any prejudice. However, given the vagueness of O.A.C. 4732-17-01(E)(2), this argument is moot.
 {¶ 19} Finally, appellant argues that the Board's order provided no explanation as to the basis for its findings in order for this court to conduct a meaningful review and, therefore, must be reversed. Since we have already determined that the Board's order was based on vague regulations, this argument is moot, but appellant's first assignment of error is well-taken.
 {¶ 20} By the second assignment of error, appellant contends that the common pleas court erred in finding that participation of "patient advocates" in the adjudicative hearing was consistent with due process. R.C. 4732.02 expressly requires three members of the Board be "patient advocates who are not mental health professionals and who either are parents or other relatives of a person who has received or is receiving mental health services or are representatives of organizations that represent persons who have received or are receiving mental health services." Appellant admitted he was not accusing any of the three patient advocates on the Board of personal bias, but argues that their position as a patient advocate prevents them from being a neutral fact finder.
 {¶ 21} Due process requires that an individual in an administrative proceeding is entitled to a fair hearing before an impartial tribunal. See In re Murchison (1955), 349 U.S. 133,136, 75 S.Ct. 623; St. Anthony Hosp. v. U.S. Dept. of Health andHuman Serv. (C.A.10 2002), 309 F.3d 680, 711. An administrative agency's determination is presumptively valid and provides that the burden is on the appellant to establish bias. Smith v. StateMed. Bd. (July 19, 2001), Franklin App. No. 00AP-1301, citingWest Virginia v. Hazardous Waste Facility Approval Bd. (1986),28 Ohio St.3d 83, 86. This case is similar to Summerfield v.Ohio State Dental Board (Dec. 3, 1998), Licking App. No. 98CA000046, where the court found the lack of specific facts supporting the allegations of bias and prejudice was insufficient to destroy due process and warrant a recusal. Appellant has the burden to prove, beyond merely stating that bias and prejudice exist, that the members are "biased, partial or prejudiced to such a degree that his presence adversely affected the board's decision." West Virginia, supra, at 86. Without a demonstration of specific bias or prejudice, appellant has failed to prove that the presence of the patient advocates denied him due process, and the trial court did not abuse its discretion in so finding. Appellant's second assignment of error is not well-taken.
 {¶ 22} By the third assignment of error, appellant contends that the common pleas court erred in finding that testimony inferring that appellant failed to cooperate with the Board's investigation was properly admitted. By the fourth assignment of error, appellant contends that the common pleas court erred in finding that the Board's refusal to provide investigative materials to appellant was consistent with due process. These assignments of error are rendered moot by our ruling on the first assignment of error.
 {¶ 23} By the fifth assignment of error, appellant contends that the common pleas court erred and abused its discretion in finding that the Board's order was based upon reliable, probative, and substantial evidence. In Our Place, Inc. v. OhioLiquor Control Comm. (1992), 63 Ohio St.3d 570, 571, the Supreme Court of Ohio defined these terms, as follows:
The evidence required by R.C. 119.12 can be defined as follows:
(1) "Reliable" evidence is evidence that is dependable; that is, it can be confidently trusted. In order to be reliable, there must be a reasonable probability that the evidence is true.
(2) "Probative" evidence is evidence that tends to prove the issue in question; it must be relevant in determining the issue.
(3) "Substantial" evidence is evidence with some weight; it must have importance and value.
(Footnotes omitted.)
 {¶ 24} Most of the evidence relating to the fee-splitting from VOC was the testimony of Client G. Appellant argues that Client G fabricated the fee-splitting story after her unemployment benefits and her workers' compensation claims had been denied. In her initial complaint to the Board, Client G did not mention the VOC payment. The Board contends that the other evidence corroborates Client G's testimony because the voucher for $3,350 from the VOC program was issued on February 9, 2001, and the warrant was issued on February 20. On February 22, 2001, Client G cashed a $1,000 check, although it was not a regularly-scheduled pay period. Client G testified that appellant gave her $1,000 on the day he received the VOC check but she could not remember when that happened. (Tr. at 344-349.) Appellant testified that he paid Client G $1,000 for overtime work she had performed in January and February. Client G admitted that she worked overtime in January and February.
 {¶ 25} Client G.'s behavior and testimony was at times incredible. An example involves an incident on June 26, 2001, when appellant fired Client G and she had a pair of scissors and tried to stab him but Paugh restrained her. She threatened to kill appellant and Paugh. (Tr. at 80.) Paugh testified that Client G threatened to kill both appellant and him several times. (Tr. at 655-656.) Client G testified that appellant was on a telephone that did not work and she was attempting to cut the telephone cord because the phone did not work. (Tr. at 382.) Four days later she went to the emergency room and subsequently she filed a workers' compensation claim asserting that appellant stabbed her with the scissors, but the claim was denied. Client G described the scissors incident, as follows:
Q. When Dr. Serednesky told you that you were being terminated, what did you do?
* * *
A. I got quite upset and I went into — I believe, if I remember correctly — I could be wrong — that he asked me to stay to the end of the day. I went into — I went into my billing office and I was shaking very badly and I started — I was trying to do my work and I came outside — came back outside the building office and he was on what I call the batman phone that led straight downstairs to the medical center where the patients are. And I didn't understand why he was on that phone because it had not been working, you know.
And I was — walked up behind him and I was thinking — I said "Well, this phone don't work, so I'm going to cut the cord on the phone. I don't understand why he's talking on this phone that don't work." So I went to cut the cord and he turned around and I guess he thought I was trying to cut him. And that's when I bent down to cut the cord on the telephone and that's when he grabbed my right arm and almost broke it and we got into a little altercation.
Q. So just so I understand it, you approached him?
A. Yes, I approached him from behind.
Q. His back was to you?
A. Yes.
Q. You've got a pair of scissors in your hand?
A. Yes.
Q. And your intention was to cut the cord on the phone because the phone wasn't working?
A. Yes.
(Tr. at 381-383.)
 {¶ 26} Client G also testified that she had problems working with Aulisio because Michelle was "lazy and tried to jeopardize my [Client G's] sanity even further." (Tr. at 370.) Client G stated that Aulisio played psychological games with her, made faces at her and led her to believe she was having sex with appellant. (Tr. at 370.) When asked when Aulisio told her that she was having sex with appellant, Client G replied:
A. She didn't tell me. I said she played psychological games with me like sitting in the office with her legs cocked open.
Q. And you inferred from that that meant she was having sex with Dr. Serednesky?
A. Yes, because I would find hairs all over his desk — female hairs on his desk.
* * *
Q. What else did Michelle do that led you to believe that she was having sex with Dr. Serednesky?
A. Well, one particular day there were approximately four or five patients in the office. I believe they were supposedly working on something. I don't know if it was a book or something, some type of work that he had her doing, but they were in there such an unusually long amount of time. It was well over an hour or two hours. The patients were neglected. They were walking all over the place. I didn't know what to do, you know. So it made me think they were doing something in there.
Q. Okay. So I assume there were all these sounds consistent with sex coming from the office? You didn't hear that, did you?
A. I didn't hear nothing.
* * *
A. What's the problem with Charlie? It's that I felt like he had conspired against me. They all had. I felt like they all had. Once they found out after June 18 that I filed a complaint, they all had conspired against me to drive me insane to the point where I would be mentally unable to testify against them.
Q. How did Dr. Serednesky, Charlie Paugh, and Michelle find out that you had filed a complaint with the Board of Psychology?
A. I don't know. I certainly didn't tell them. I don't know how they found out.
Q. What makes you think they found out?
A. I think maybe my — one of the patients might have told them. I don't know.
Q. How would the patients know that you filed a complaint with the Board of Psychology?
A. The City of Columbus is like Peyton Place. I don't know.
* * *
Q. How did those things you told us about make you insane?
* * *
A. Because she knew that I had a crush on Dr. Serednesky and I think she wanted me to know that she was going over to his house at night having sex with him.
* * *
Q. How did you find that out?
A. I didn't.
Q. All right.
A. I just — I just thought that. I have no proof whatsoever.
(Tr. at 371-376.)
 {¶ 27} Given the fact that much of Client G.'s testimony was not reliable, probative, and substantial and that there is no evidence other than her testimony concerning the splitting of the VOC funds, we find the trial court did abuse its discretion in affirming the Board's order. Appellant's fifth assignment of error is well-taken regarding the finding of improper fee-splitting.
 {¶ 28} For the foregoing reasons, appellant's first and fifth assignments of error are sustained, the second assignment of error is overruled, the third and fourth assignments of error are moot, and the judgment of the common pleas court is reversed, and this matter is remanded to that court with instructions to reverse the order of the Board.
Judgment reversed; cause remanded with instructions.
Klatt, P.J. and Petree, J., concur.
[1] Currently, R.C. 4732.17(A)(5) and (7) are the same requirements.
[2] Current O.A.C. 4732-17-01(E)(2) provides the same language.