[Cite as *Lake Front Med., L.L.C. v. Ohio Dept. of Commerce*, 2022-Ohio-4281.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## LAKE COUNTY

| | |
|---|---|
| LAKE FRONT MEDICAL, LLC, | CASE NO. 2021-L-102 |
| Appellant, | |
| - v - | Administrative Appeal from the Court of Common Pleas |
| OHIO DEPARTMENT OF COMMERCE, | Trial Court No. 2021 CV 000104 |
| Appellee. | |

**O P I N I O N**

Decided: November 30, 2022
Judgment: Affirmed

*David V. Patton*, 34194 Aurora Road, Suite 242, Solon, OH 44139; and *Michael R. Moran*, Michael R. Moran Co., LPA, 106 Short Street, P.O. Box 307437, Gahanna, OH 43230 (For Appellant).

*Dave Yost*, Ohio Attorney General, State Office Tower, 30 East Broad Street, 16th Floor, Columbus, OH 43215; and *Natasha Natale*, Attorney General's Office, 20 Federal Plaza, Third Floor, Youngstown, OH 44503 (For Appellee).

MARY JANE TRAPP, J.

{¶1} Appellant, Lake Front Medical, LLC ("Lake Front"), appeals from the judgment entry of the Lake County Court of Common Pleas affirming the final order of appellee, Ohio Department of Commerce ("the department"). In its final order, the department denied Lake Front's application for a medical marijuana processor provisional license.

{¶2} Lake Front asserts 11 assignments of error on appeal, which we review out of order and, at times, collectively.

{¶3} Lake Front's second assignment of error relates to the department's scoring of the security plan portion of its application. Lake Front contends that the department's final order was not in accordance with law because the department ignored the "uncontroverted" testimony of its security expert in violation of a decision from the Supreme Court of Ohio.

{¶4} Lake Front's first, fifth, sixth, seventh, and ninth assignments of error challenge the department's use of nonmandatory criteria in scoring applications (the "disputed criteria"). Lake Front contends that the department's final order is not in accordance with law because, respectively, (1) the disputed criteria is "unlawful"; (2) use of the disputed criteria violated R.C. 3796.03(B)(2)(a); (3) use of the disputed criteria violated R.C. 3796.09(B)(6); (4) the department was not permitted to "unilaterally invent" the disputed criteria; and (5) there is no lawful authority for a competitive license application process.

{¶5} Lake Front's third, fourth, and eighth assignments of error challenge the department's scoring of the quality assurance plan portion of its application. Lake Front contends that the department's final order was not in accordance with law because, respectively, (1) the department relied on a rescinded rule; (2) the department's notice of opportunity for a hearing failed to list 21 C.F.R. 117 as a law or rule involved, in violation of R.C. 119.07; and (3) the department used non-department employees and independent contractors to score its application, in violation of Ohio Adm.Code 3796:3-1-03(A).

{¶6} Finally, Lake Front's tenth and eleventh assignments of error allege that the department violated its due process rights. Lake Front contends that the department's final order was not in accordance with law because, respectively, (1) the delay between

2

the filing of Lake Front's application and the department's final order violated its due process rights; and (2) the hearing officer failed to conduct a "de novo" hearing in violation of Lake Front's statutory and due process rights.

{¶7}    After a careful review of the record and pertinent law, we find as follows:

{¶8}    (1) We find no error in the trial court's legal determination regarding expert testimony.  The relevant issue was whether Lake Front's security plan was properly scored in relation to the established criteria.  Lake Front cites no legal authority that requires expert testimony in this or any similar context.  In addition, the department countered Lake Front's expert testimony with the testimony of a member of the department's scoring team and documentary evidence.  Since there was competing evidence in the record, the department was not required to adopt the expert's opinions.

{¶9}    (2) We find no error in the trial court's determinations that the arguments in Lake Front's first and third through ninth assignments of error were rendered moot based on Lake Front's failure to establish that it met the mandatory criteria for its security plan. Although Lake Front's arguments raise interesting administrative law issues, it would have been a purely academic exercise for the trial court to address their merits.  Likewise, since we have found no merit to Lake Front's second assignment of error, it would be a purely academic exercise for this court to address their merits.

{¶10} (3) We find no error in the trial court's legal determinations that the department did not violate Lake Front's due process rights.  Cases in which courts have found a due process violation based on unreasonable delay in an administrative proceeding are readily distinguishable.  In addition, the statements from the hearing officer that Lake Front challenges relate to Lake Front's burden of proof at the administrative hearing.  Courts have held that a license applicant at an administrative

3

Case No. 2021-L-102

hearing has the burden to demonstrate the department should have granted it the requested license.

{¶11} In sum, Lake Front has not established that the trial court erred in affirming the department's final order. Thus, we affirm the judgment of the Lake County Court of Common Pleas.

**Substantive and Procedural History**

{¶12} This case involves the department's denial of Lake Front's application for a medical marijuana processor provisional license.

*The MMCP*

{¶13} In 2016, the General Assembly enacted R.C. Chapter 3796 to authorize the use of medical marijuana and to establish the medical marijuana control program ("MMCP"). *See* R.C. 3796.02. The General Assembly instructed the department to adopt rules establishing standards and procedures for the MMCP. *See* R.C. 3796.03(A)(1).

{¶14} The department subsequently adopted Ohio Adm.Code Chapter 3796, including rules for the licensure of medical marijuana processors. *See* Ohio Adm.Code 3796:3-1. A "processor" is "an entity that has been issued a certificate of operation by the department to manufacture medical marijuana products." Ohio Adm.Code 3796:1-1-01(A)(39).

{¶15} Until September 8, 2018, the director was authorized to issue up to 40 processor provisional licenses. Ohio Adm.Code 3796:3-1-01(A). After that date, the director may, in its discretion, issue additional processor provisional licenses if certain conditions are met. *See* Ohio Adm.Code 3796:3-1-01(B).

{¶16} A processor provisional license application must be submitted in accordance with R.C. Chapter 3796 and Ohio Adm.Code Chapter 3796. Ohio Adm.Code

4

3796:3-1-02(B). The rules governing the department's review and ranking of applications are set forth in Ohio Adm.Code 3796:3-1-03. The rules provide that a provisional license "shall be issued to the qualified applicant receiving at least the minimum required score in each category and the highest total score overall as compared to the other applicants." Ohio Adm.Code 3796:3-1-04(A).

### *Request for Applications; Scoring*

{¶17} The department issued a request for applications and an instructions packet for parties interested in operating as a medical marijuana processor. As part of its application, an applicant was required to submit narrative descriptions of the following five plans: (1) a business plan, (2) an operations plan, (3) a quality assurance plan, (4) a security plan, and (5) a financial plan. *See* Ohio Adm.Code 3796:3-1-02(B)(2)-(6); Ohio Adm.Code 3796:3-1-03(B)(1)-(5).

{¶18} The department utilized three-person scoring teams to review and score each of the five plans. An applicant was required to meet a minimum score in each of the five plans. For the security plan, an applicant was required to receive a minimum score of 12 out of 20 points. For the quality assurance plan, an applicant was required to receive a minimum score of 18 out of 30 points.

{¶19} The department developed a scoresheet for each plan. The scoresheet was divided into separate pages for each component of the plan. Each page included criteria that were required by rule, which were listed in bold and italics (the "mandatory criteria"), and additional criteria that were not required by rule (the "disputed criteria"), which were listed in regular type.

{¶20} The scoring team gave each plan a numeric score based on how many criteria the applicant met on each page. However, an applicant did not receive any points

5

on a particular page without meeting the mandatory criteria, regardless of how many disputed criteria were met. According to the department, the disputed criteria allowed the scoring teams to competitively rank the applicants who met the mandatory criteria.

*Denial of Lake Front's Application*

{¶21} Lake Front submitted its application in December 2017. The department subsequently determined that Lake Front did not meet the minimum required scores for the security plan and the quality assurance plan. Specifically, Lake Front received a score of 5 for the security plan, which did not meet the minimum required score of 12. Lake Front received a score of 12 for the quality assurance plan, which did not meet the minimum required score of 18.

{¶22} Only 14 of 104 applicants met all of the minimum requirements in all five plans. The department issued those applicants provisional licenses. Nearly all of the remaining applicants had failed the security plan portion of their applications. In October 2018, the department issued a clarification request to the remaining applicants, including Lake Front, relating to the security plan. Applicants were required to submit a revised facility plot plan and to affirm a commitment to comply with certain rule requirements.

{¶23} Lake Front submitted a response to the clarification request. The department again determined that Lake Front did not meet the minimum required score for the security plan. Specifically, Lake Front received a score of 6, which did not meet the minimum required score of 12.

{¶24} In January 2019, the department issued a "notice of intent" to deny Lake Front's application for a processor provisional license and "notice of opportunity for hearing." The notice stated that Lake Front did not meet the minimum required scores for the security plan and the quality assurance plan.

6

### *Administrative Hearing*

**{¶25}** Lake Front requested an administrative hearing, which was ultimately held before a hearing officer over two days in October 2019 and one day in January 2020. Both sides presented testimony from witnesses and submitted numerous exhibits.

**{¶26}** Lake Front contended that its security plan and its quality assurance plan satisfied all of the required licensure requirements. In support, Lake Front presented testimony from Anthony Romero, who served as the project manager for Lake Front's application, and Timothy Dimoff ("Mr. Dimoff"), who Lake Front identified as a security expert.

**{¶27}** The state presented testimony from Elizabeth Bailik ("Ms. Bailik"), a member of the scoring team for the security plan, and Daniel Kenny, a member of the scoring team for the quality assurance plan. Both witnesses testified that Lake Front's plans did not meet the minimum requirements for a provisional license.

**{¶28}** Lake Front also contended that the disputed criteria were "unlawful" because the department did not formally adopt them as rules pursuant to the rulemaking procedures in R.C. Chapter 119. The department countered that it was permitted to include the disputed criteria so that it could competitively rank applicants. It also contended that Lake Front's argument was "irrelevant" because the department did not disqualify Lake Front's application based on the disputed criteria. Rather, Lake Front was unable to meet the mandatory criteria.

### *Recommendation; Final Order; Appeal*

**{¶29}** In April 2020, the hearing officer issued a 49-page report and recommendation. The hearing officer found that Lake Front failed to meet its burden of proof to demonstrate that it obtained the minimum required scores for the security plan

7

or the quality assurance plan. Lake Front filed 58 objections to the hearing officer's report and recommendation. In January 2021, the department issued a final order, approving the hearing officer's recommendation and denying Lake Front's application.

{¶30} Lake Front appealed to the Lake County Court of Common Pleas and asserted 72 assignments of error. Following additional briefing, the trial court issued a detailed judgment entry finding that Lake Front's assignments of error were without merit. The trial court determined that the department's final order was supported by reliable, probative, and substantial evidence and was in accordance with law. Accordingly, the trial court affirmed the department's final order.

{¶31} Lake Front appealed to this court and presents the following 11 assignments of error for our review:

{¶32} "[1.] The trial court erred as a matter of law in affirming the Final Order because the Department used unlawful 'Disputed Criteria' to score LFM's application. Therefore, the Final Order is not in accordance with law in violation of R.C. 119.12(D).

{¶33} "[2.] The trial court erred as a matter of law in affirming the Final Order because the Department ignored uncontroverted expert witness testimony in violation of *Williams*. Therefore, the Final Order is not in accordance with law in violation of R.C. 119.12(D).

{¶34} "[3.] The trial court erred as a matter of law in affirming the Final Order because the Department relied upon a rescinded rule to score LFM's application. Consequently, LFM's Qualify Assurance Plan must be awarded a passing score. Therefore, the Final Order is not in accordance with law in violation of R.C. 119.12(D).

{¶35} "[4.] The trial court erred as a matter of law in affirming the Final Order because the Notice failed to include 21 C.F.R. 117 among 'the law[s] or rule[s] directly

8

involved' as required by R.C. 119.07. Therefore, the Final Order is not in accordance with law in violation of R.C. 119.12(D).

{¶36} "[5.] The trial court erred as a matter of law in affirming the Final Order because the Department violated R.C. 3796.03(B)(2)(a) when it used 'Disputed Criteria' outside OAC 3796 to score LFM's application. Therefore, the Final Order is not in accordance with law in violation of R.C. 119.12(D).

{¶37} "[6.] The trial court erred as a matter of law in affirming the Final Order because the Department violated R.C. 3796.09(B)(6) when it used 'Disputed Criteria' outside OAC 3796 to score LFM's application. Therefore, the Final Order is not in accordance with law in violation of R.C. 119.12(D).

{¶38} "[7.] The trial court erred as a matter of law in affirming the Final Order because the phrase 'at a minimum' does not permit the Department to unilaterally invent 'Disputed Criteria' to score applications. Therefore, the Final Order is not in accordance with law in violation of R.C. 119.12(D).

{¶39} "[8.] The trial court erred as a matter of law because the Department violated OAC 3796:3-1-03(A) when it used non-Department employees and non-Department independent contractors to score LFM's application. Therefore, the Final Order is not in accordance with law in violation of R.C. 119.12(D).

{¶40} "[9.] The trial court erred as a matter of law in affirming the Final Order because there is no lawful authority for a competitive license application process. Therefore, the Final Order is not in accordance with law in violation of R.C. 119.12(D).

{¶41} "[10.] The trial court erred as a matter of law in affirming the Final Order because the delay between LFM's application and the Final Order was too long in

9

violation of LFM's due process rights. Therefore, the Final Order is not in accordance with law in violation of R.C. 119.12(D).

{¶42} "[11.] The trial court erred as a matter of law in affirming the Final Order because the Department failed to provide LFM with a *de novo* hearing in violation of LFM's statutory and due process rights. Therefore, the Final Order is not in accordance with law in violation of R.C. 119.12(D)."

### Standard of Review

{¶43} In reviewing an order of an administrative agency under R.C. 119.12, a common pleas court must consider the entire record to determine whether reliable, probative, and substantial evidence supports the agency's order and whether the order is in accordance with law. *Univ. of Cincinnati v. Conrad*, 63 Ohio St.2d 108, 110, 407 N.E.2d 1265 (1980). An appellate court's review of an administrative decision is more limited. *Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d 619, 621, 614 N.E.2d 748 (1993).

{¶44} While the common pleas court must examine the evidence, "[s]uch is not the charge of the appellate court." *Rossford Exempted Village School Dist. Bd. of Edn. v. State Bd. of Edn.*, 63 Ohio St.3d 705, 707, 590 N.E.2d 1240 (1992). The appellate court is to determine only whether the common pleas court abused its discretion. *Id.* An abuse of discretion is the trial court's "'failure to exercise sound, reasonable, and legal decision-making.'" *State v. Beechler*, 2d Dist. Clark No. 09-CA-54, 2010-Ohio-1900, ¶ 62, quoting *Black's Law Dictionary* 11 (8th Ed.Rev.2004). On review of purely legal questions, however, an appellate court has de novo review. *Big Bob's, Inc. v. Ohio Liquor Control Comm.*, 151 Ohio App.3d 498, 2003-Ohio-418, 784 N.E.2d 753, ¶ 15 (10th Dist.); *see Univ. Hosp., Univ. of Cincinnati College of Medicine v. State Emp. Relations Bd.*, 63 Ohio St.3d 339, 343, 587 N.E.2d 835 (1992).

10

Case No. 2021-L-102

{¶45} For ease of discussion, we address Lake Front's assignments of error out of order and, at times, collectively.

## Expert Testimony

{¶46} We first address Lake Front's second assignment of error, which relates to the department's scoring of its security plan. Lake Front contends that the department's final order was not in accordance with law because the department ignored the "uncontroverted" testimony of its security expert in violation of the Supreme Court of Ohio's decision in *In re Williams*, 60 Ohio St.3d 85, 573 N.E.2d 638 (1991).

{¶47} The trial court determined that *Williams* was not applicable in the present case. We agree.

{¶48} In *Williams*, the state medical board alleged that a doctor failed to conform to minimal standards of medical practice in the manner in which he prescribed controlled substances in a weight control program. At a hearing before a board examiner, the doctor presented expert testimony from two physicians. The physicians testified that while the doctor's decisions reflected a minority school of thought, they did not fall below the acceptable standard of medical practice. However, the board disagreed and ultimately suspended the doctor's license. *See id.* at 85-87.

{¶49} The Supreme Court of Ohio stated that "[w]hile the board need not, in every case, present expert testimony to support a charge against an accused physician, the charge must be supported by some reliable, probative and substantial evidence." *Id.* at 87. The expert testimony was the "only evidence in the record" on the relevant issue. *Id.* The court held that the "[w]hile the board has broad discretion to resolve evidentiary conflicts, * * * and determine the weight to be given expert testimony, * * * it cannot convert its own disagreement with an expert's opinion into affirmative evidence of a contrary

11

Case No. 2021-L-102

proposition where the issue is one on which medical experts are divided and there is no statute or rule governing the situation." *Id.*

{¶50} Lake Front first contends that since the department lacked "relevant specialized knowledge" of "security matters in general" and "medical marijuana security issues in particular," it was required to accept Mr. Dimoff's expert opinion even if it disagreed with him. In *Williams*, the relevant issue was whether a doctor's decisions fell below the acceptable standard of medical care, which is generally beyond the common knowledge and understanding of a layperson. *See Bruni v. Tatsumi*, 46 Ohio St.2d 127, 130, 346 N.E.2d 673 (1976) ("The issue as to whether the physician and surgeon has proceeded in the treatment of a patient with the requisite standard of care and skill must ordinarily be determined from the testimony of medical experts"). Since the state medical board is composed primarily of health professionals, however, the Supreme Court of Ohio has held that "it may rely on its own expertise to determine whether a physician failed to conform to minimum standards of care." *Arlen v. State*, 61 Ohio St.2d 168, 172, 399 N.E.2d 1251 (1980). Here, the relevant issue was whether Lake Front's security plan was properly scored in relation to the established criteria. Lake Front cites no legal authority that requires expert testimony in this or any similar context.

{¶51} Lake Front next contends that the department converted its own disagreement with Mr. Dimoff's expert opinion into affirmative evidence of a contrary proposition. In *Williams*, the expert testimony was the only evidence in the record on the relevant issue. *See id.* at 87. As the Supreme Court later explained, "[t]he *Williams* court found that the board's case failed due to a lack of evidence, not because the board failed to present expert testimony." *State Med. Bd. of Ohio v. Murray*, 66 Ohio St.3d 527, 534, 613 N.E.2d 636 (1993). Here, the department countered Mr. Dimoff's testimony with the

12

testimony of Ms. Bailik, who was a member of the department's scoring team, as well as documentary evidence. Since there was competing evidence in the record regarding whether Lake Front's security plan was properly scored, the department was not required to adopt Mr. Dimoff's opinions.

{¶52} Accordingly, we find no error in the trial court's legal determination.

{¶53} Lake Front's second assignment of error is without merit.

**Mootness**

{¶54} We next address Lake Front's first and third through ninth assignments of error, which assert arguments that the trial court found to be moot.

{¶55} Lake Front's first, fifth, sixth, seventh, and ninth assignments of error challenge the disputed criteria. Specifically, Lake Front contends that the department's final order is not in accordance with law because, respectively, (1) the disputed criteria is "unlawful"; (2) use of the disputed criteria violated R.C. 3796.03(B)(2)(a); (3) use of the disputed criteria violated R.C. 3796.09(B)(6); (4) the department was not permitted to "unilaterally invent" the disputed criteria; and (5) there is no lawful authority for a competitive license application process.

{¶56} Lake Front's third, fourth, and eighth assignments of error challenge the department's scoring of its quality assurance plan. Specifically, Lake Front contends that the department's final order was not in accordance with law because, respectively, (1) the department relied on a rescinded rule; (2) the department's notice of opportunity for a hearing failed to list 21 C.F.R. 117 as a law or rule involved, in violation of R.C. 119.07; and (3) the department used non-department employees and independent contractors to score its application, in violation of Ohio Adm.Code 3796:3-1-03(A).

13

{¶57} The trial court found that the foregoing arguments were moot because Lake Front did not establish that it met the mandatory criteria for its security plan. Lake Front does not address the trial court's mootness determinations in its appellant's brief. Rather, Lake Front focuses solely on the substantive merits of its arguments. In its appellee's brief, the department defends the trial court's mootness determinations and notes that Lake Front does "not appear to challenge" them. In its reply brief, Lake Front counters that "[n]one of the assignments of error are moot" and sets forth additional argument.

{¶58} App.R. 16(C) provides that a reply brief may be filed merely as an opportunity to reply to the brief of the appellee, not to raise any new issues. *State v. Shaffer*, 11th Dist. Portage No. 2002-P-0133, 2004-Ohio-336, ¶ 39; *see also* Loc.R. 16(D) ("Reply briefs shall be restricted to matters of rebuttal of the answer brief * * *"). Despite Lake Front's failure to properly raise the issue, we will review the trial court's mootness determinations in the interest of justice.

{¶59} Actions become moot when resolution of the issues presented is purely academic and will have no practical effect on the legal relations between the parties. *Brookwood Presbyterian Church v. Ohio Dept. of Edn.*, 10th Dist. Franklin No. 12AP-487, 2013-Ohio-3260, ¶ 9. According to the Supreme Court of Ohio, "it is the duty of every judicial tribunal to decide actual controversies between parties legitimately affected by specific facts and to render judgments which can be carried into effect. It has become settled judicial responsibility for courts to refrain from giving opinions on abstract propositions and to avoid the imposition by judgment of premature declarations or advice upon potential controversies. The extension of this principle includes * * * questions which are moot * * *." *Fortner v. Thomas*, 22 Ohio St.2d 13, 14, 257 N.E.2d 371 (1970).

14

Case No. 2021-L-102

{¶60} By finding no merit to Lake Front's assignment of error regarding its security plan, the trial court effectively rendered moot many of Lake Front's remaining arguments. This is a common occurrence when a court functions as an appellate court. *See* App.R. 12(A)(1)(c) (requiring appellate courts to "decide each assignment of error and give reasons in writing for its decision * * * [u]nless an assignment of error is made moot by a ruling on another assignment of error"). Although Lake Front's arguments raise interesting administrative law issues, it would have been a purely academic exercise for the trial court to address their merits. Likewise, since we have found no merit to Lake Front's second assignment of error, it would be a purely academic exercise for this court to address their merits.

{¶61} Lake Front contends that its arguments were not moot because R.C. 119.12(D) includes the phrase "in accordance with law." According to Lake Front, an agency order can be supported by "reliable, probative, and substantial evidence" but still be reversed for failing to be "in accordance with law." In support, Lake Front cites the Tenth District Court of Appeals' decision in *Pruneau v. Ohio Dept. of Commerce, Bur. of Wage & Hour*, 191 Ohio App.3d 588, 2010-Ohio-6043, 947 N.E.2d 201 (10th Dist.).

{¶62} R.C. 119.12(D) sets forth a trial court's required standard of review of an agency order. It does not purport to abrogate the mootness doctrine. In addition, *Pruneau* does not support Lake Front's position. Lake Front cites the paragraph in *Pruneau* where the Tenth District summarized its holdings. *See id.* at ¶ 43. However, *Pruneau* involved two agency orders and two sets of appellants. *See id.* at ¶ 2-7. The Tenth District affirmed the trial court's determinations that the first order was supported by substantial, reliable, and probative evidence and was in accordance with law. *See id.* at ¶ 22. With respect to the second order, the Tenth District reversed the trial court's determination that those

15

appellants were not prejudiced by the agency's failure to provide adequate notice of their alleged statutory violation. *See id.* at ¶ 41. Therefore, *Pruneau* is inapposite.

{¶63} Lake Front next argues in the alternative that an exception to the mootness doctrine applied because the department's use of the disputed criteria "is capable of repetition yet evading review." This exception applies only when "[1] the challenged action is too short in duration to be fully litigated before its cessation or expiration, and [2] there is a reasonable expectation that *the same complaining party* will be subject to the same action again." (Emphasis added.) *State ex rel. Dispatch Printing Co. v. Louden*, 91 Ohio St.3d 61, 64, 741 N.E.2d 517 (2001). Lake Front does not acknowledge the foregoing requirements, and there is no indication that either is met.

{¶64} Lake Front further argues that the MMCP is an issue of "great public importance," which implicates another exception to the mootness doctrine, i.e., "where the matter appealed is one of great public or general interest." *Franchise Developers, Inc. v. Cincinnati*, 30 Ohio St.3d 28, 505 N.E.2d 966 (1987), paragraph one of the syllabus. Generally, however, this exception is reserved for the highest court of the state. *Rock House Fitness Inc. v. Himes*, 2021-Ohio-245, 167 N.E.3d 499, ¶ 41 (11th Dist.).

{¶65} Contrary to Lake Front's assertion, this does not mean that the lawfulness of the disputed criteria will always evade review. Rather, such arguments would be available to applicants who met the required minimum scores but were denied a provisional license because of the department's application of the disputed criteria and/or competitive ranking.

{¶66} Accordingly, we find no error in the trial court's mootness determinations.

{¶67} Lake Front's first and third through ninth assignments of error are without merit.

16

Case No. 2021-L-102

**{¶68}** Finally, we address Lake Front's tenth and eleventh assignments of error, where Lake Front alleges that the department violated its due process rights.

### *Delay*

**{¶69}** In its tenth assignment of error, Lake Front contends that the department's final order was not in accordance with law because the delay between Lake Front's filing of its application and the department's final order violated Lake Front's due process rights.

**{¶70}** The trial court found no violation of Lake Front's due process rights based on alleged delay. We agree.

**{¶71}** Although "due process" lacks a precise definition, courts have held that due process requires both notice and an opportunity to be heard. *In re Thompkins*, 115 Ohio St.3d 409, 2007-Ohio-5238, 875 N.E.2d 582, ¶ 13. "Due process requires that an individual in an administrative proceeding is entitled to a fair hearing before an impartial tribunal." *Serednesky v. Ohio State Bd. of Psychology*, 10th Dist. Franklin No. 05AP-633, 2006-Ohio-3146, ¶ 21.

**{¶72}** Lake Front cites cases where courts have found a due process violation based on unreasonable delay in an administrative proceeding. We find these cases to be readily distinguishable. For instance, two cases involved companies whose licenses were at risk of revocation for alleged violations of Ohio law. *See Yellow Cab Leasing, Inc. v. Ohio Motor Vehicles Dealers Bd.*, 5th Dist. Stark No. 2002CA00105, 2002-Ohio-5296, ¶ 1-2 (vehicle dealer's license); *Morgan v. Liquor Control Comm.*, 10th Dist. Franklin No. 08A-1088, 2009-Ohio-3232, ¶ 2 (liquor permit). In both cases, the state agency failed to hold a timely hearing on the alleged violations. *See Yellow Cab* at ¶ 13 (562 days after the party's request for a hearing); *Morgan* at ¶ 21 (36 months after the

17

Case No. 2021-L-102

alleged permit violations). The court's decision in *Yellow Cab* was based primarily on R.C. 119.07, which provides that "[t]he date set for the *hearing* shall be within fifteen days, but not earlier than seven days, after the party has *requested a hearing*, unless otherwise agreed to by both the agency and the party." (Emphasis added.) *See id.* at ¶ 14-15.

{¶73} In addition, the delay in those cases was prejudicial. In *Yellow Cab*, the license holder "had the stigma of an ongoing citation and * * * no means to pursue expeditious vindication. Even the criminal process recognizes a grand jury cannot continue its investigation beyond its term." *Id.* at ¶ 20. In *Morgan*, "the permit holder * * * would have suffered from the stigma associated with a pending violation threatening its continued holding of its liquor permit." *Id.* at ¶ 20. In *In re Milton Hardware Co.*, 19 Ohio App.2d 157, 250 N.E.2d 262 (10th Dist.1969), the court found that a continuance of over two years was "an unreasonable period of time to keep an employer-taxpayer in limbo concerning his status as a contributor" under Ohio's unemployment compensation laws. *Id.* at 166.

{¶74} Here, Lake Front challenges the aggregate of time periods of alleged "delay" between the filing of its application and the department's final order. However, neither R.C. 119.07 nor the foregoing cases impose time limits beyond the scheduling of the administrative hearing. In fact, the department scheduled a hearing 13 days after Lake Front's request. In addition, Lake Front did not experience any stigma from the alleged delay as in *Yellow Cab* and *Morgan* or face the prospect of significant financial liability as in *Milton Hardware*. Further, the reasons for the alleged "delay" are apparent from the record. Prior to the issuance of its "notice of intent," the department had to review Lake Front's and the other applicants' voluminous application materials. In fact, Lake Front acknowledges that the department "was dealing with a new regulatory program

18

concerning a novel subject matter." Prior to the preparation and issuance of his report and recommendation, the hearing officer had to review the evidentiary record and the parties' closing briefs. Prior to the preparation and issuance of its final order, the department had to review, among other things, Lake Front's 53 objections. The fact that an administrative proceeding takes time does not necessarily equate to unfairness.

{¶75} Accordingly, we find no error in the trial court's legal determination.

{¶76} Lake Front's tenth assignment of error is without merit.

### De Novo Hearing

{¶77} In its eleventh assignment of error, Lake Front contends that the department's final order was not in accordance with law because the hearing officer failed to conduct a "de novo" hearing in violation of Lake Front's statutory and due process rights.

{¶78} The trial court found no violation of Lake Front's rights. We agree.

{¶79} As an initial matter, Lake Front does not specify what it means by a "de novo" hearing. The term "de novo" literally means "anew." *Black's Law Dictionary*, de novo (11th Ed.2019). A "hearing de novo" can mean "[a] reviewing court's *decision of a matter anew*, giving *no deference* to a lower court's findings," as well as "[a] *new hearing* of a matter, conducted as if the original hearing had not taken place." (Emphasis added.) *Black's Law Dictionary*, hearing (11th Ed.2019). R.C. 119.09 governs the procedural requirements of an administrative hearing. It does not use the term "de novo," and Lake Front does not allege that the hearing officer violated any of its express requirements.

{¶80} It appears Lake Front objects to the hearing officer's references to the department's scoring of Lake Front's application. For instance, Lake Front contends that the hearing officer "unlawfully assumed as an established fact that [Lake Front's]

19

Case No. 2021-L-102

application failed to meet the minimum scoring thresholds" and that the hearing officer "made up his mind before the hearing even started."

{¶81} The hearing officer's statements relate to Lake Front's burden of proof at the administrative hearing rather than being indicative of improper bias or deference. As the Tenth District has explained in a similar context, a license applicant at an administrative hearing has the burden "to demonstrate the department should have granted it the requested license." *Solomon Cultivation Corp. v. Ohio Dept. of Commerce*, 10th Dist. Franklin No. 20AP-175, 2021-Ohio-46, ¶ 32, *appeal not accepted*, 163 Ohio St.3d 1418, 2021-Ohio-1606, 167 N.E.3d 973 (involving an application for a medical marijuana cultivator provisional license). "It is a fundamental concept in administrative law and procedure that the party asserting the affirmative of an issue bears the burden of proof." *Smith v. Columbus*, 10th Dist. Franklin No. 02AP-1219, 2003-Ohio-3303, ¶ 24. Further, as the trial court aptly explained below, "[w]hether [Lake Front] showed in its Security Plan that it met the Mandatory Criteria or showed that the Scoring Team erred in finding that [Lake Front's] Security Plan did not meet the Mandatory Criteria are two ways of asking the same question."

{¶82} Accordingly, we find no error in the trial court's legal determination.

{¶83} Lake Front's eleventh assignment of error is without merit.

{¶84} In sum, Lake Front has not established that the trial court erred in affirming the department's final order.

{¶85} For the foregoing reasons, the judgment of the Lake County Court of Common Pleas is affirmed.


JOHN J. EKLUND, J., concurs,

Case No. 2021-L-102

MATT LYNCH, J., concurs with a Concurring Opinion.

_____

MATT LYNCH, J., concurs with a Concurring Opinion.

{¶86} I concur with the majority's judgment affirming the present matter given that the record does not demonstrate the actions of the common pleas court rose to the level of an abuse of discretion. I write separately to address concerns with the considerable exercise of administrative authority in this case and its impact on those entities seeking to obtain medical marijuana processor permits.

{¶87} In matters involving the grant of a processor permit, it is without question that the legislature delegated to the Ohio Department of Commerce the ability to create the standards that must be met by permit applicants. This set of rules was established through Chapter 3796 of the Ohio Administrative Code. This delegation of authority, when combined with other concerns such as the Department of Commerce's adoption and use of additional evaluation criteria outside of the Administrative Code and the substantial authority granted to the panels evaluating the permit applications, raises questions regarding the overreach of administrative authority.

{¶88} Concerns with the exercise of administrative authority have been consistently raised in the United States Supreme Court as well as in courts throughout this country. The involvement of administrative agencies in the day-to-day lives of citizens, as well as the power these agencies wield in decision-making and enforcement, is significant. Unfortunately, such power may be exercised in a manner that oversteps the bounds of entities that are simply not a coequal branch of government, whether by overreach of agency power or through statutory authority allocated to such agencies

21

Case No. 2021-L-102

beyond that which is reasonable.

{¶89} The U.S. Supreme Court, in *Natl. Fedn. of Indep. Business v. Dept. of Labor, Occupational Safety & Health Administration*, 595 U.S. ___, 142 S.Ct. 661 (2022), has most recently reaffirmed the principle that the legislature may not abandon its constitutional responsibilities by the grant of unchecked authority to administrative agencies:

> The nondelegation doctrine ensures democratic accountability by preventing Congress from intentionally delegating its legislative powers to unelected officials. Sometimes lawmakers may be tempted to delegate power to agencies to "reduc[e] the degree to which they will be held accountable for unpopular actions." R. Cass, Delegation Reconsidered: A Delegation Doctrine for the Modern Administrative State, 40 Harv. J. L. Pub. Pol'y 147, 154 (2017). But the Constitution imposes some boundaries here. *Gundy* [*v. United States*], 588 U.S. [__, 139 S.Ct. 2116, 2131, 204 L.Ed.2d 522] (GORSUCH, J., dissenting). If Congress could hand off all its legislative powers to unelected agency officials, it "would dash the whole scheme" of our Constitution and enable intrusions into the private lives and freedoms of Americans by bare edict rather than only with the consent of their elected representatives. *Department of Transportation v. Association of American Railroads*, 575 U.S. 43, 61, 135 S.Ct. 1225, 191 L.Ed.2d 153 (2015) (ALITO, J., concurring); see also M. McConnell, The President Who Would Not Be King 326-335 (2020); I. Wurman, Nondelegation at the Founding, 130 Yale L. J. 1490, 1502 (2021).

*Id.* at 669 (Gorsuch, J., concurring).

{¶90} This concern with the unchecked power of administrative agencies is not a new one. Over 65 years ago, it was observed that "[t]he rise of administrative bodies probably has been the most significant legal trend of the last century[.] * * * They have become a veritable fourth branch of the Government, which has deranged our three-branch legal theories * * *." *Fed. Trade Comm. v. Ruberoid Co.*, 343 U.S. 470, 487, 72 S.Ct. 800, 96 L.Ed. 1081 (1952) (Jackson, J., dissenting) (administrative agencies "have begun to have important consequences on personal rights").

22

Case No. 2021-L-102

{¶91} Overreach or unchecked power by administrative agencies impacts all citizens of this country. In *City of Arlington, Tex. v. F.C.C.*, 569 U.S. 290, 313, 315, 133 S.Ct. 1863, 185 L.Ed.2d 941 (2013) (Roberts, J., dissenting), Chief Justice John Roberts observed that "the danger posed by the growing power of the administrative state cannot be dismissed," emphasizing that the administrative state "wields vast power and touches almost every aspect of daily life." (Citation omitted.) As he aptly observed, "[t]he Framers could hardly have envisioned today's 'vast and varied federal bureaucracy' and the authority administrative agencies now hold over our economic, social, and political activities." (Citation omitted.) *Id.* at 313.

{¶92} While the administrative agencies within our country serve a valid purpose, their power to act in a role that goes beyond the scope of their authority undercuts citizens' rights and expectations to due process, consistent results, and confuses the role of the different branches of our government. United States Supreme Court Justice Neil Gorsuch has frequently expressed these concerns in his tenure as a federal judge, emphasizing that the implementation of policies by administrative agencies can often be inconsistent with the separation of powers doctrine and noting the impact of administrative agencies wielding too much power. *Gutierrez-Brizuela v. Lynch*, 834 F.3d 1142, 1158 (10th Cir.2016) (Gorsuch, J., concurring). More recently, Justice Gorsuch again warned against the dangers to the doctrine of the separation of powers posed by administrative agencies:

> Our Nation's founders were painfully aware of the dangers of executive and legislative intrusion on judicial decision-making. One of the abuses of royal power that led to the American Revolution was King George's attempt to gain influence over colonial judges. Colonial legislatures, too, had interfered with the courts' independence "at the behest of private interests and factions." These experiences had taught the founders that "'there is no liberty if the power of judgment be not separated from the legislative and

23

executive powers.'" They knew that when political actors are left free not only to adopt and enforce written laws, but also to control the interpretation of those laws, the legal rights of "litigants with unpopular or minority causes or . . . who belong to despised or suspect classes" count for little. Maybe the powerful, well-heeled, popular, and connected can wheedle favorable outcomes from a system like that—but what about everyone else? They are left always a little unsure what the law is, at the mercy of political actors and the shifting winds of popular opinion, and without the chance for a fair hearing before a neutral judge. The rule of law begins to bleed into the rule of men.

(Footnotes omitted.) *Kisor v. Wilkie*, 588 U.S. ___, 139 S.Ct. 2400, 2437-2438, 204 L.Ed.2d 841 (2019) (Gorsuch, J., concurring).

{¶93} There are multiple concerns with the process exercised here to approve processor permits. The legislature tasked the Ohio Department of Commerce with creating the rules under which such permits may be granted. This gives the Department significant power over the outcome of permitting medical marijuana processors, which is significant when taking into account that use of marijuana is the type of controversial decision with which Justice Gorsuch expressed concern. Nonetheless, the administrative agency has the legal authority to formulate such regulations and set them forth in the Administrative Code, thereby giving the public knowledge of the rules that must be followed to obtain a permit. In addition to utilizing this power, however, the Department created additional rules, referred to as "non-mandatory," which were not published in the Administrative Code or otherwise adopted in a manner that clearly conveyed them to the parties seeking permits. This is the type of exercise of authority which is concerning. Those parties seeking permits were unable to successfully gain points in certain areas in the absence of advance notice of the criteria to be considered. For example, Elizabeth Bailik testified that there was a criteria for installation of fencing or other protection methods that were not required under the Administrative Code. The panel gave credit to

24

permit seekers who included in their security plan evidence of dog patrols, underground security systems, or double fencing. She stated that since such security measures went "above and beyond what the rule requires * * * that would get you additional credit." Not only were processors unaware of precisely what would be required to get additional points by referencing the Administrative Code but the testimony also appeared to indicate that there were no clear guidelines within the Department itself about what would be required to satisfy the non-mandatory criteria.

{¶94} It is accurate that Lake Front's failure to meet the mandatory criteria would prevent it from receiving a permit even had these additional non-mandatory criteria been known and met, thereby preventing reversal on this issue. Nonetheless, it should be emphasized that this exercise of power in creating and utilizing rules unclear to the parties is not a fully transparent process and can have a detrimental impact on those parties applying for a permit. It allowed the panels to utilize their own interpretations of the rules in scoring. As Justice Gorsuch observed, such a process by an administrative authority results in the public "left always a little unsure what the law is." *Kisor* at 2438.

{¶95} Further, the overall process implemented for determining the permit scoring may be viewed with some skepticism. The team reviewing the security plan, for example, was not comprised of any security professionals but of individuals with backgrounds in areas such as environmental permit writing, architecture, and information technology. According to testimony presented, they were trained for a day and then tasked with reviewing security plans for processor permits. Rather than using expertise to determine whether the plans satisfied the rules, they made judgment calls by applying the rules as they understood them. Given the amount of discretion these teams had to determine

25

Case No. 2021-L-102

whether both the rule and non-rule requirements were met, the lack of specialization in the area being evaluated is concerning.

{¶96} With the foregoing in mind, close consideration of the entirety of the testimony presented by both sides shows that there were arguable issues of fact supported by testimony from both parties on several of the relevant mandatory factors. For this reason, this court correctly declines to find an abuse of discretion in the common pleas court's decision to affirm the Department's order. Under this limited standard of review, the record warrants such a conclusion.

{¶97} I respectfully concur, with the caveat that actions taken by administrative agencies must be closely reviewed to ensure they do not go beyond the bounds of their authority or usurp the power of the three co-equal branches of government.

Case No. 2021-L-102